EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Giovanny Toro Martínez<br><br>Recurrido | Certiorari<br><br>2018 TSPR 145<br><br>200 DPR ____ |

Número del Caso: CC-2014-630


Fecha: 6 de agosto de 2018


Tribunal de Apelaciones:

      Región Judicial de Ponce

Oficina del Procurador General:

      Lcdo. Isaías Sánchez Báez
      Procurador General

      Lcda. Tanaira Padilla Rodríguez
      Sub Procurador General

      Lcdo. Iván Rivera Labrador
      Procurador General Auxiliar


Abogado de la parte recurrida:

      Lcda. Emma Cristina Torres Martínez


Materia: Derecho Constitucional y Procedimiento Criminal: No se viola la cláusula de doble exposición cuando el Tribunal de Apelaciones absuelve a un acusado al revocar una sentencia condenatoria y el Estado recurre ante Tribunal Supremo solicitando que se reinstale el dictamen del foro primario. Es improcedente que el Tribunal de Apelaciones suprima una identificación cuando no están presentes los requisitos establecidos en la Regla 234 de Procedimiento Criminal. Requisito de la existencia de pasión, prejuicio, parcialidad o un error manifiesto para poder sustituir la adjudicación de credibilidad que hizo el juzgador en el Tribunal de Primera Instancia en los casos en que de ello dependa el valor probatorio de una identificación.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Giovanny Toro Martínez<br><br>Recurrido | CC-2014-0630 |

**El Juez Asociado señor RIVERA GARCÍA emitió la opinión del Tribunal.**

En San Juan, Puerto Rico, a 6 de agosto de 2018.

El presente caso requiere que examinemos si se infringe la protección constitucional contra la doble exposición cuando este Tribunal revisa un dictamen del Tribunal de Apelaciones que revocó una sentencia condenatoria al suprimir cierta prueba de identificación y se solicita que se reestablezca el dictamen del foro primario. De contestar que no se infringe la protección constitucional, debemos evaluar si el Tribunal de Apelaciones podía suprimir la referida prueba de identificación cuando la defensa nunca solicitó su exclusión en el Tribunal de Primera Instancia.

Por los fundamentos que exponemos a continuación, revocamos el dictamen recurrido emitido por el Tribunal de Apelaciones y reinstalamos la sentencia condenatoria del Tribunal de Primera Instancia.

I

El Sr. Giovanny Toro Martínez (señor Toro Martínez o recurrido) fue acusado y procesado por tribunal de derecho de

cometer el delito de asesinato en primer grado en su modalidad de asesinato estatutario y violar la Ley de Armas de Puerto Rico.[1] En específico, el Estado le imputó dar muerte al Sr. Julián Vélez Vega (señor Vélez Vega) en el Municipio de Yauco al utilizar un arma de fuego mientras intentaba robar un establecimiento comercial.

Conforme la prueba que se desfiló en el juicio, el 21 de febrero de 2012 el señor Vélez Vega se encontraba en su negocio, "Juliancito Gas Service", cuando entró un hombre con el rostro cubierto y un arma de fuego. Este último le exigió la entrega del dinero, pero en un forcejeo el individuo disparó y mató al señor Vélez Vega. Luego la persona se dirigió donde la Sra. Maribel Pérez Morales (señora Pérez Morales) ——quien laboraba como secretaria en Juliancito Gas Service y se encontraba trabajando en el comercio en el área de su escritorio— y le requirió el dinero. Esta le indicó que no había dinero en el lugar. Tras el evento dentro del negocio, el individuo salió y caminó en dirección al centro del pueblo de Yauco. Al momento de los hechos el Sr. Hipólito Feliciano Jácome (señor Feliciano Jácome) realizaba labores de limpieza en la acera al otro lado del referido establecimiento comercial y pudo observar en varias ocasiones al asaltante.

Como parte de la prueba de cargo se presentaron los testigos siguientes: (1) la Sra. Midalis Ortiz Rosario, viuda

---

[1] La acusación fue al amparo del Art. 106(b) del Código Penal de Puerto Rico de 2004, 33 LPRA ant. sec. 4734, y el Art. 5.04 de la Ley de Armas de Puerto Rico, 25 LPRA sec. 458(c).

del señor Vélez Vega; (2) la señora Pérez Morales, quien, como mencionamos, se encontraba en el lugar de los hechos; (3) el señor Feliciano Jácome, quien identificó al acusado como el autor de los delitos imputados; (4) el agente Alexis Caraballo Santiago, agente de la policía que acudió a la escena del crimen; (5) el Sr. Edward Pérez Benítez, perito en balística; y (6) el agente José Torres Cruz (agente Torres Cruz), agente investigador de la escena del crimen. Como testigo de la defensa, se presentó el testimonio del Sr. Amady Toro Pacheco, padre del recurrido.

Escuchado el testimonio de los testigos presentados por el Ministerio Público y el señor Toro Martínez, y evaluada la totalidad de la prueba que tuvo ante sí, el Tribunal de Primera Instancia emitió un fallo de culpabilidad por todos los delitos imputados. Razonó que el testimonio del señor Feliciano Jácome le merecía entera credibilidad y que, unido al resto de la prueba admitida, sostenía la culpabilidad del recurrido más allá de duda razonable.

Inconforme, el señor Toro Martínez acudió al Tribunal de Apelaciones. En esencia, sostuvo que las inconsistencias de lo declarado por los testigos no permitían sostener una convicción. Arguyó, en particular, que no procedía otorgar credibilidad al principal testigo de cargo, el señor Feliciano Jácome.[2]

---

[2] Otro de los planteamientos del señor Toro Martínez fue que el Tribunal de Primera Instancia erró al imponer la pena por el Art. 5.04 de la Ley de Armas de Puerto Rico.

El foro apelativo, al evaluar la foto de la rueda de identificación, concluyó que la identificación fue sugestiva y que carecía de confiabilidad para ser admitida en el juicio. Resolvió que la identificación realizada en el juicio era insuficiente. En ese sentido, suprimió la evidencia de identificación y revocó la sentencia condenatoria.[3] El Estado presentó una *Moción de reconsideración* oportuna que fue denegada por el foro intermedio.[4]

No conteste con la decisión del Tribunal de Apelaciones, el Estado recurrió ante este Tribunal mediante un recurso de *certiorari.* Señaló la comisión de los errores siguientes:

A. ERRÓ EL TRIBUNAL DE APELACIONES AL SUPRIMIR LA IDENTIFICACIÓN QUE SE REALIZÓ DEL SEÑOR TORO MARTÍNEZ, CUANDO LA DEFENSA NUNCA PRESENTÓ UNA MOCIÓN DE SUPRESIÓN DE IDENTIFICACIÓN A LA LUZ DE LA REGLA 234 DE PROCEDIMIENTO CRIMINAL, NI EN ESTE CASO SE DA ALGUNA DE LAS EXCEPCIONES QUE PERMITEN QUE SE SUPRIMA UNA IDENTIFICACIÓN LUEGO DE PASADO EL TÉRMINO ESTABLECIDO POR LA REGLA 234 DE PROCEDIMIENTO CRIMINAL.

B. ERRÓ EL TRIBUNAL DE APELACIONES AL SUPRIMIR LA IDENTIFICACIÓN DEL ACUSADO, CUANDO EN EL ALEGATO DE LA DEFENSA NO SE PRESENTÓ ERROR ALGUNO, NI SE ARGUMENTÓ EN CUANTO A LA ADMISIBILIDAD O NO DE LA IDENTIFICACIÓN.

C. ERRÓ EL TRIBUNAL DE APELACIONES AL SUPRIMIR LA IDENTIFICACIÓN DEL ACUSADO, AL NO DARLE LA DEFERENCIA DEBIDA A LA DETERMINACIÓN DEL FORO DE INSTANCIA ANTE LA INEXISTENCIA DE PASIÓN, PREJUICIO, PARCIALIDAD O ERROR MANIFIESTO.

Solicitó que revocáramos la sentencia del foro intermedio y reestableciéramos el fallo y la sentencia condenatoria del foro primario.

---

[3] *Sentencia* en el Apéndice de la Petición de *certiorari*, pág. 93.

[4] *Resolución* en el Apéndice de la Petición de *certiorari*, pág. 111.

Por su parte, el señor Toro Martínez alegó que este Tribunal no tiene jurisdicción para atender el recurso instado por el Estado. Aduce que en <u>Evans v. Michigan</u>, 568 US 313 (2013), el Tribunal Supremo de Estado Unidos determinó que la absolución de un acusado, por más errónea que sea, activa la protección contra la doble exposición e impide que el Ministerio Público procese de nuevo a esa persona por el mismo delito. Arguye que la determinación del Tribunal de Apelaciones de suprimir la identificación del señor Toro Martínez, resolver que la prueba restante no era suficiente para sostener la convicción y revocar la sentencia del foro primario, constituye una absolución que impide que revisemos su corrección. Además, argumentó que el foro apelativo intermedio no erró al suprimir la identificación y al revocar la sentencia condenatoria porque el proceso para identificar al señor Toro Martínez como autor de los delitos imputados fue sugestivo.

Expedido el recurso de *certiorari* y con la comparecencia de las partes, por incidir sobre nuestra autoridad para atender el caso de autos, atenderemos primero el planteamiento del señor Toro Martínez sobre nuestra facultad para revisar el dictamen del foro apelativo intermedio.

## II

"Un principio básico del acervo jurídico puertorriqueño es que ninguna persona será puesta en riesgo de ser castigada

dos veces por el mismo delito".[5] Tanto la Enmienda Quinta de la Constitución de Estados Unidos, como la Sec. 11 de la Carta de Derechos de la Constitución de Puerto Rico reconocen esta protección.[6]

Es importante tomar en consideración que el informe de la Comisión de Derechos Civiles de la Convención Constituyente señaló que la intención al incorporar la Sec. 11 del Art. II de nuestra Constitución era asegurar a nuestros ciudadanos los mismos derechos que se habían consagrado bajo el derecho común. Allí se expresó que esta "sección contiene las garantías que protegen al acusado en el derecho común. Se expresan en la forma tradicional para incorporar así el significado jurídico que han adquirido en las interpretaciones judiciales".[7] En virtud de lo anterior, el derecho angloamericano es trascendental al interpretar la garantía que nos ocupa. En específico, resulta sumamente ilustrativa la jurisprudencia elaborada con posterioridad a las enmiendas incluidas al *Criminal Appeals Act* en 1970. De ahí en adelante el debate se centró en determinar qué

---

[5] Pueblo v. Santiago, 160 DPR 618, 626 (2003), Soto v. Tribunal Superior, 90 DPR 517 (1964); Pueblo v. Rivera Ramos, 88 DPR 612 (1963).

[6] En particular, nuestra Constitución dispone que "[n]adie será puesto en riesgo de ser castigado dos veces por el mismo delito". Art. II, Sec. 11, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 354. Véase Const. EU, Enm. V (no person "[…] shall be subject for the same offence to be twice put in jeopardy of life or limb […]"). Sabido es que la protección constitucional contra la doble exposición contenida en la Constitución federal aplica a los estados a través de su Decimocuarta Enmienda. Benton v. Maryland, 395 DPR 784, 794 (1969). De igual manera, como derecho fundamental, aplica a Puerto Rico. Sin embargo, "[n]o hay base para sostener que se le haya dado o que se le deba dar un contenido mayor a la cláusula similar en la Constitución de Puerto Rico". E.L. Chiesa, Derecho procesal penal de Puerto Rico y Estados Unidos, 1ra ed., Colombia, Forum, 1992, Vol. II, sec. 16.1, pág. 350.

[7] 4 Diario de Sesiones de la Convención Constituyente 2568-2569 (1961); Pueblo v. Santiago, *supra*, pág. 627 esc. 8.

apelaciones o revisiones presentadas por el Estado estaban prohibidas por la Constitución federal.[8] Ello se debe a que estas enmiendas al estatuto tuvieron el objetivo de ampliar y establecer la facultad del Estado de apelar en casos criminales hasta el máximo permitido por la Enmienda Quinta de la Constitución de Estados Unidos.[9]

Aunque la cláusula constitucional contra la doble exposición ha sido descrita como una garantía que sirve varios propósitos o como una garantía que sirve un único propósito —la finalidad de los veredictos— con varias ramificaciones, su naturaleza fundamental difícilmente puede ser cuestionada.[10] El objetivo general dimanante de esta disposición es evitar que el Estado, con todos sus recursos y poderes, abuse de su autoridad y hostigue a un ciudadano con múltiples procedimientos al intentar conseguir su convicción por la comisión de una misma conducta delictiva.[11] También tiene el propósito de proteger al ciudadano de vivir

---

[8] United States v. Scott, 437 US 82, 85 (1978). Para una discusión más amplia de la historia que precede a la revisión judicial en procesos criminales, véase íd.

[9] United States v. Scott, supra, págs. 85-86 ("[Since those amendments] our previous cases construing the statute proved to be of little assistance in determining when the Double Jeopardy Clause of the Fifth Amendment would prohibit further prosecution"); Serfass v. United States, 420 US 377, 387 (1975) ("it is clear to us that Congress intended to authorize an appeal to a court of appeals in this kind of case so long as further prosecution would not be barred by the Double Jeopardy Clause"); United States v. Wilson, 420 US 332, 337 (1975) ("Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit").

[10] Benton v. Maryland, 395 US 784, 795 (1969). Véase, además, United States v. DiFrancesco, 449 US 117, 128 (1980); W.R. LaFave y otros, Criminal Procedure, 4ta ed., Thomson Reuters, 2015, Vol. 6, Sec. 25.1(b), pág. 757.

[11] Ohio v. Johnson, 467 US 493, 498-499 (1984); Benton v. Maryland, supra, pág. 796, Green v. United States, 355 US 184, 187 (1957). Véanse, además: Pueblo v. Santiago, supra, pág. 627; Pueblo v. Martínez Torres, 126 DPR 561, 568 (1990); Pueblo v. Tribunal Superior, 104 DPR 626, 628 (1976).

ansioso e inseguro en la incertidumbre de que, aun siendo inocente, pueda ser encontrado culpable en cualquier ocasión.[12] Más aún, impide que el Estado tenga una segunda oportunidad para presentar prueba y que tome ventaja de la información obtenida en el primer juicio en cuanto a las fortalezas y las debilidades del caso.[13] Sin duda, la Cláusula de Doble Exposición constituye una barrera a que concedamos al Estado la ocasión del proverbio "*second bite at the apple*".[14]

Según hemos reconocido esta protección se activa en cuatro escenarios, a saber: (1) contra la ulterior exposición tras la absolución de la persona por la misma ofensa; (2) contra la ulterior exposición tras la convicción por la misma ofensa; (3) contra la ulterior exposición tras la exposición anterior por la misma ofensa porque comenzó el juicio, aunque no culminó en la absolución ni en la convicción; y (4) contra los castigos múltiples por la misma ofensa.[15] Es decir, esta protege contra castigos múltiples, así como procesos múltiples y sucesivos.[16]

---

[12] Ohio v. Johnson, *supra*, págs. 498-499; United States v. DiFrancesco, *supra*, págs. 127-128; United States v. Scott, *supra*, pág. 87; United States v. Dinitz, 424 US 600, 606 (1976); Benton v. Maryland, *supra*, pág. 796; Green v. United States, *supra*, pág. 187; Pueblo v. Santiago, *supra*, págs. 627-628; Pueblo v. Martínez Torres, *supra,* pág. 568.

[13] Pueblo v. Santiago, *supra*, pág. 628.

[14] Burks v. United States, 437 US 1, 17 (1978).

[15] Pueblo v. Santiago, *supra*, pág. 628; Pueblo v. Martínez Torres, *supra*, págs. 568-569. Véanse, además: Ohio v. Johnson, *supra*, pág. 498; United States v. DiFrancesco, *supra*, pág. 129; North Carolina v. Pearce, 395 US 711, 717 (1969).

[16] Pueblo v. Santiago, *supra*, pág. 628. Cónsono con ello, como requisito para que la protección constitucional se active, *en primer lugar*, hemos establecido que "el procedimiento y la sanción a la que esté sujeto el individuo deben ser de naturaleza criminal o conllevar el estigma o privación de libertad o propiedad que caracterizan al

En consideración al dictamen emitido por el tribunal de apelaciones en el caso de autos, resulta imprescindible abordar la normativa adoptada en Pueblo v. Martínez Torres, 126 DPR 561 (1990), —recientemente reiterada en Pueblo v. Santos Santos, 189 DPR 361 (2013)— respecto a aquellas instancias en que se revoca la convicción por la *insuficiencia de la prueba* (*evidentiary insufficiency*) *vis à vis* la revocación de la convicción por un *error de derecho ("trial error")*, que iba en desarrollo y se reconoció claramente en Burks v. United States, 437 US 1 (1978).[17] En concordancia con la casuística federal, establecimos que la protección constitucional contra la doble exposición se activa, como excepción, en casos en que la revocación del fallo o veredicto de culpabilidad es producto de la insuficiencia de la prueba admitida en el juicio. Sin embargo, pautamos que cuando la insuficiencia surge de la exclusión a nivel apelativo de toda

---

procedimiento criminal". Íd., al hacer referencia a United States v. Halper, 490 US 435 (1989); O.E. Resumil, Práctica jurídica de Puerto Rico: derecho procesal penal, New Hampshire, Ed. Butterworth Legal Publishers, 1993, T. 2, Sec. 26.2(a), pág. 287; Chiesa Aponte, op. cit., Sec. 16.1(A), pág. 350. Véase, además: Pueblo v. Martínez Torres, *supra*, pág. 568. *Segundo*, el juicio debe haber comenzado o haberse celebrado bajo un pliego acusatorio válido y en un tribunal con jurisdicción. Pueblo v. Santiago, *supra*, pág. 629; Pueblo v. Martínez Torres, *supra*, pág. 568. *Finalmente*, en el subsiguiente proceso el Estado debe pretender procesar a la persona por la misma conducta delictiva por la que fue convicto, absuelto o expuesto a ser convicto previamente. Íd.

[17] Lockhart v. Nelson, 488 US 33 (1988); Montana v. Hall, 481 US 400, 402 (1987). En Burks v. United States, *supra*, el Tribunal Supremo de Estados Unidos, incluso, aclaró que no procede ordenar un nuevo juicio cuando la revocación de la sentencia condenatoria se da por el fundamento de insuficiencia de la prueba admitida en el juicio. En esos casos el foro revisor está obligado a absolver al acusado como se supone hiciera el jurado o el juez en el foro de instancia. Ello aunque el acusado solicite en la alternativa la celebración de un nuevo juicio. Para algunos casos que reconocían esta facultad y fueron revocados en ese aspecto, véanse los siguientes: Forman v. United States, 361 US 416 (1960); Yates v. United States, 354 US 298 (1957); Sapir v. United States, 348 US 373 (1955); Bryan v. United States, 338 US 552 (1950).

o alguna evidencia admitida erróneamente en el juicio, la deficiencia es un error de derecho que no activa la disposición constitucional. Esto permite que un tribunal revisor ordene al foro primario a celebrar un juicio nuevo. Señalamos que un error de derecho

> nada implica respecto a la culpa o inocencia del acusado. Por el contrario, equivale a una determinación de que el acusado ha sido convicto mediante un proceso judicial defectuoso en algún aspecto fundamental, por ejemplo, admisión o supresión errónea de la prueba, instrucciones defectuosas o conducta indebida por parte del fiscal. […].[18]

El curso de acción en los llamados errores de derecho se debe a que existe un interés de la sociedad en que aquellos que quebrantaron sus leyes sean castigados.[19] En el caso de evidencia suprimida a nivel apelativo, si la prueba presentada por el Ministerio Público y admitida en el juicio era suficiente en derecho para sostener la convicción, resultaría en un contrasentido que proceda absolver a la persona acusada de cometer el delito.[20] En el caso de que el juez de instancia hubiera excluido la evidencia inadmisible, el Pueblo hubiera tenido la oportunidad de presentar otra prueba sobre el mismo punto.

No obstante, el impedimento ante la insuficiencia de la prueba admitida en el juicio surge porque la determinación del tribunal revisor es que la prueba que tuvo ante sí el

---

[18] Pueblo v. Martínez Torres, *supra*, págs. 570-571.

[19] Pueblo v. Martínez Torres, *supra*, pág. 571; Burks v. United States, *supra*, pág. 15; United States v. Tateo, 377 US 463, 466 (1964) ("It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction").

[20] Lockhart v. Nelson, 488 US 33, 39 (1988).

juzgador de los hechos, y con la cual quedó sometido el caso, no sostenía la culpabilidad del acusado más allá de duda razonable.[21] De lo contrario se concedería al Estado una segunda oportunidad para desfilar la prueba que en el primer juicio no presentó y, por tanto, permitir el riesgo de que someta nuevamente un caso con prueba suficiente cuando en el primer juicio no lo hizo.[22] Ello, sin duda, quebrantaría los principios de la Cláusula de Doble Exposición y hace imperativo decretar la absolución definitiva del acusado sin que pueda celebrarse un nuevo juicio en el tribunal de instancia. Después de todo, en esta última instancia, el dictamen absolutorio en los méritos que hace el foro revisor por insuficiencia de la prueba, de advenir final y firme, en nada es distinto al que hubiera hecho el juzgador de los hechos, el cual hubiese impedido un segundo juicio en el tribunal de instancia.

Cabe mencionar que al amparo de la distinción entre errores de derecho y absoluciones en los méritos por insuficiencia de la prueba, en Pueblo v. Santos Santos, *supra*, reconsideramos un dictamen absolutorio que emitimos por equivocación y ordenamos la celebración de un nuevo juicio contra un acusado.

Ahora bien, la situación ante nuestra consideración es más clara que la que presentaba Pueblo v. Santos Santos, *supra*. En esta ocasión no se solicita que ordenemos la

---

[21] Burks v. United States, *supra*, págs. 10-11.

[22] Pueblo v. Martínez Torres, *supra*, pág. 571; Burks v. United States, *supra*, pág. 11.

celebración de un nuevo juicio. En el caso ante nos el Estado recurre de un dictamen emitido por un tribunal revisor, que en el caso de ser errado, no conllevaría tramite ulterior, sino el restablecimiento de la sentencia condenatoria.

Un caso normativo sobre el asunto mencionado es United States v. Wilson, 420 US 332 (1975). Allí un jurado emitió un veredicto de culpabilidad contra el Sr. George J. Wilson, pero el juez de instancia desestimó la acusación porque el tiempo transcurrido entre la acusación y los hechos imputados habían puesto al señor Wilson en un estado de indefensión. Luego de que el Estado apelara, el Tribunal de Apelaciones para el Tercer Circuito determinó que la cláusula contra la doble exposición impedía la revisión, ya que tenía el efecto de absolver al acusado. El Estado recurrió. El Tribunal Supremo de Estados Unidos resolvió que no se infringe la protección contra la doble exposición de la Constitución federal cuando la revisión ——en el ámbito federal establecida como *apelación*—— no pone en peligro al acusado a un segundo juicio por la misma ofensa. Es decir, estableció que el Estado podía apelar si la corrección del error no concedería una nueva oportunidad al Ministerio Público, es decir, que se podía disponer del caso sin sujetar al acusado a un segundo juicio a petición del Estado. Resultan reveladoras las expresiones siguientes emitidas del más alto Foro Judicial federal:

> [I]t is well settled that an appellate court's order reversing a conviction is subject to further review even when the appellate court has ordered the indictment dismissed and the defendant

discharged. *Forman v. United States*, 361 U.S. 416, 426, 80 S.Ct. 481, 487, 4 L.Ed.2d 412, 419 (1960). **If reversal by a court of appeals operated to deprive the Government of its right to seek further review, disposition in the court of appeals would be "tantamount to a verdict of acquittal at the hands of the jury, not subject to review by motion for rehearing, appeal, or certiorari in this Court."** Ibid. See also *United States v. Shotwell Mfg. Co.*, 355 U.S. 233, 243, 78 S.Ct. 245, 251, 2 L.Ed.2d 234, 240 (1957).

It is difficult to see why the rule should be any different simply because the defendant has gotten a favorable postverdict ruling of law from the District Judge rather than from the Court of Appeals, or because the District Judge has relied to some degree on evidence presented at trial in making his ruling. Although review of any ruling of law discharging a defendant obviously enhances the likelihood of conviction and subjects him to continuing expense and anxiety, **a defendant has no legitimate claim to benefit from an error of law when that error could be corrected without subjecting him to a second trial before a second trier of fact**. (Énfasis y subrayado suplido).[23]

Nótese que el Tribunal reconoció que la llave para invocar la protección contra la doble exposición es en ocasiones que el acusado puede estar sujeto a múltiples juicios por la misma ofensa ante un segundo juzgador de hechos. Además, el razonamiento de la Corte Suprema fue que la corrección de un error de derecho en la etapa que presentaba el caso no concedería al Ministerio Público un nuevo juicio o sujetaría al acusado al acoso tradicionalmente asociado con los múltiples procesamientos.[24] Rechazó

---

[23] United States v. Wilson, *supra*, pág. 345.

[24] Véase United States v. Wilson, *supra*, págs. 352-353. La preocupación del Tribunal Supremo federal se contextualizó en que en ocasiones el Ministerio Público podría recurrir a un foro apelativo con el objetivo de conocer las debilidades de la prueba que presentó en el primer juicio con el objetivo de fortalecer el caso y obtener un nuevo juicio. No obstante, debemos notar que en ese momento no se había aclarado la norma en Burks v. United States, *supra*, a los efectos de que si con la prueba presentada y admitida en el juicio el Estado no probó más allá de

expresamente que el acusado pudiera aprovecharse de un error de derecho cuando podía corregirse de la manera antes mencionada. Como la revisión del caso se daba tras que el juez emitiera un dictamen a favor del acusado luego de un veredicto de culpabilidad, no se infringía la Cláusula de Doble Exposición.

Cónsono con ello, en Pueblo v. Rivera Ortiz, 150 DPR 457, 464 (2000), expresamos que "[s]i el juez resuelve absolver perentoriamente al acusado, luego de un veredicto de culpabilidad, […] nos encontramos ante un error de derecho, apelable ante un tribunal de superior jerarquía, sin que se esté en violación de la cláusula de doble exposición".[25] En esa ocasión reafirmamos que "[l]a clave está en que no exista posibilidad de que el imputado tenga que someterse a un nuevo juicio por la misma ofensa". (Bastardillas omitidas). Al igual que la Corte Suprema de Estados Unidos, concluimos que en estas circunstancias el Estado podía recurrir del fallo absolutorio porque, de prevalecer, solo procedería reinstalar el veredicto de culpabilidad y continuar con el trámite de la sentencia sin necesidad de evaluar elementos fácticos del

---

duda razonable la culpabilidad del acusado lo que procede es absolver al acusado. Luego de Burks este riesgo quedó disipado.

[25] Véase, además: Pueblo v. Colón, Castillo, 140 DPR 564 (1996), el cual revocamos la absolución perentoria de tres coacusados porque el juez de instancia rebasó los límites de su función y usurpó la función del jurado al dejar sin efecto el veredicto de culpabilidad. Véase, además, Chiesa, op. cit., Sec. 16.2(B), pág. 370 ("Si el juez declara con lugar una moción de absolución perentoria luego de emitido un veredicto de culpabilidad […], el Pueblo podría revisar en apelación —certiorari— esta determinación absolutoria del juez si está basada en un error de derecho").

caso. Esta norma ha sido reafirmada en innumerables ocasiones.[26]

Ciertamente, la Corte Suprema de Estados Unidos ha reconocido que el dictamen de "no culpable" o absolutorio constituye un impedimento para que un foro revisor revoque la determinación y ordene la celebración de un nuevo juicio por el delito que fue absuelto.[27] De hecho, está firmemente establecido que el fallo o veredicto absolutorio, por más erróneo que resulte ser, impide un subsiguiente procesamiento por el mismo delito.[28] No obstante, aplicar esta norma constitucional es mucho más complejo que la mera literalidad de las expresiones en que se sostiene el señor Toro Martínez.

*En primer lugar*, "la protección contra la doble exposición no es absoluta ni automática, atendiendo el interés que tiene la sociedad de que se brinde al Ministerio Público una oportunidad adecuada para procesar a aquellos que violan la ley y así impedir que la comisión de delitos quede impune".[29] Este Tribunal ni la Corte Suprema federal han extendido la protección contra la doble exposición al nivel de que estemos impedidos de revisar una sentencia revocatoria

---

[26] Véanse, e.g.: Schiro v. Farley, 510 US 222, 230 (1994); United States v. Martin Linen Supply Co., 430 US 564 (1977). Conforme ha sido definida, la absolución es el dictamen, correcto o incorrecto, de algunos o todos los elementos fácticos de la ofensa o el delito imputado. United States v. Scott, *supra*, pág. 97.

[27] E.g.: Benton v. Maryland, *supra*; Green v. United States, *supra*; United States v. Ball, 163 US 662 (1896). De igual manera lo reconocimos nosotros. Pueblo v. Pérez Martínez, 84 DPR 181, 183 (1961).

[28] Sanabria v. United States, 437 US 54, 64 (1978); Green v. United States, *supra*, pág. 188; Fong Foo v. United States, 369 US 141, 143 (1962); Chiesa Aponte, op. cit., Sec. 16.2(F), pág. 386.

[29] Pueblo v. Santiago, *supra*, págs. 634-635, al hacer referencia a Ohio v. Johnson, *supra*, pág. 502; Arizona v. Washington, 434 US 497, 509 (1978).

de una convicción emitida por un tribunal apelativo tras suprimir cierta evidencia. Por el contrario, aun en lo que representaría un contexto similar, hemos resuelto que ni siquiera el foro primario puede emitir un fallo absolutorio en una vista señalada para la discusión de una moción de supresión de evidencia.[30] Un pronunciamiento de este tipo en la vista de supresión es un acto *ultra vires* y nulo revisable, por constituir una cuestión de derecho, ante el foro apelativo.[31] Es difícil ver por qué la norma debe ser distinta cuando el Tribunal de Apelaciones "absuelve" al acusado luego de suprimir cierta prueba presentada en el juicio por el Ministerio Público.

*En segundo lugar,* debemos tener presente que en aquellas ocasiones que el acusado apela con el objetivo de que se revoque un fallo o veredicto de culpabilidad, como norma general, este renuncia voluntariamente a la protección constitucional contra la doble exposición.[32] La apelación que presenta el acusado lo sujeta a los trámites que producto de la misma procedan en derecho.[33]

La doctrina también defiende esta facultad de los Tribunales luego de una sentencia revocatoria de un tribunal

---

[30] Pueblo v. Martínez Torres, *supra*, págs. 577-578; Pueblo v. Rivera Rivera, 117 DPR 283 (1986).

[31] Pueblo v. Martínez Torres, *supra*, págs. 577-578.

[32] United States v. Scott, *supra*, págs. 98-99 ("The Double Jeopardy Clause, which guards against Government oppression, does not relieve a defendant from the consequences of his voluntary choice"); Chiesa Aponte, op. cit., Sec. 16.3, pág. 284.

[33] Chiesa Aponte, op. cit., Sec. 16.3, pág. 284 (Cuando un acusado apela una sentencia condenatoria "asiente implícitamente a ulterior exposición por la misma ofensa, al menos en cuanto al proceso apelativo y, en la mayoría de los casos se expone a sí mismo a un nuevo juicio como resultado probable de su apelación").

apelativo si existe un fallo o veredicto de culpabilidad previo. Se sostiene que al igual que la revisión es permisible luego de que el tribunal de instancia concede una moción de absolución tras un veredicto de culpabilidad, de la misma forma está disponible la revisión de la situación equivalente: la revisión efectuada por un tribunal de superior jerarquía sobre la absolución dictada por un tribunal apelativo después de revocar una convicción.[34]

Así las cosas, aunque el señor Toro Martínez hace referencia a Evans v. Michigan, *supra*, para sostener que nuestra revisión infringiría la Cláusula de Doble Exposición, la situación que presentaba el referido caso es patentemente distinguible. En Evans el foro primario judicial en el estado de Michigan absolvió a un acusado al concluir incorrectamente que el Ministerio Público no probó todos los elementos del delito imputado. Esto sucedió tras que el Estado culminara su turno de prueba a mitad del juicio. El foro apelativo del estado revocó al tribunal de instancia y el Tribunal Supremo de Michigan confirmó el dictamen recurrido. La controversia que tuvo ante su consideración el Tribunal Supremo federal fue si esa absolución, aunque fuera claramente errónea, constituía una absolución para propósitos de la doble exposición. Concluyó que sí: la absolución del acusado

---

[34] Lafave y otros, op cit., Vol. 6, Sec. 25.4(b), págs. 835-836 ("Just as appeal is permissible from a trial court's granting of motion for acquittal after a jury verdict of guilty, an appeal similarly will be available from what is the equivalent of an appellate court's entry of an acquittal after conviction, that is, its conclusion that there was insufficient evidence to convict. Here too, if the government prevails, the defendant is not subject to a new trial, but to reinstatement of the trial court's judgment of conviction.").

impedía un nuevo juicio, aunque el dictamen absolutorio fuera consecuencia de una interpretación errónea de la ley en cuanto a los elementos que se requería probar por el Ministerio Público.[35]

Sin embargo, ello no cambió la norma prevaleciente. Si bien se expresó que una absolución en los méritos decretada por un tribunal de instancia por aspectos de la culpabilidad o inocencia del acusado, aunque sea por fundamentos claramente erróneos, constituye una absolución para efectos de la Cláusula de Doble Exposición, este principio había sido reconocido desde Green v. United States, 355 US 184, 188 (1957), Fong Foo v. United States, 369 US 141, 143 (1962), y ratificado explícitamente en Sanabria v. United States, 437 US 54, 64 (1978), y otros casos previos a Evans v. Michigan, *supra*.

A diferencia del caso ante nos y la jurisprudencia que se ha elaborado en ambas jurisdicciones, tanto estatal como federal, en Evans v. Michigan, *supra*, no hubo un veredicto o fallo de culpabilidad previo. Por ello, el Tribunal hubiera tenido que exponer al acusado a un proceso sobre la misma ofensa sobre la cual había sido absuelto en los méritos en el foro primario por insuficiencia de la prueba. Esto fue lo que activó la protección contra la doble exposición e impidió al Estado apelar y la celebración de un nuevo juicio. De hecho,

---

[35] Evans v. Michigan, 568 US 313, 318 (2013), al hacer referencia a Fong Foo v. United States, *supra*, pág. 143 ("In answering this question, we do not write on a clean slate. Quite the opposite. It has been half a century since we first recognized that the Double Jeopardy Clause bars retrial following a court-decreed acquittal, even if the acquittal is "based upon an egregiously erroneous foundation"). (Citas omitidas).

en Evans v. Michigan, *supra*, pág. 330 esc. 9, al citar a United States v. Wilson, *supra*, la Corte Suprema de Estados Unidos reafirmó que si el tribunal concede una moción de absolución luego de que el jurado ha convicto, no hay barrera de doble exposición, porque la revocación resultará en el restablecimiento del veredicto de culpabilidad, no un nuevo juicio.

No hay duda entonces de que la existencia de un fallo o veredicto de culpabilidad tras celebrarse el juicio tiene repercusiones sustanciales en la facultad de revisar un dictamen absolutorio emitido con posterioridad en el mismo caso.[36] Nótese que el impedimento del Estado de recurrir a un foro revisor no se da cuando el Estado consiguió previamente una convicción en el foro primario y un juez —o un tribunal apelativo— posteriormente deja sin efecto este fallo o veredicto.[37] En otros términos, es si el Estado no obtuvo en el foro de instancia un fallo o veredicto de culpabilidad del acusado que procesos subsiguientes a la absolución en los méritos para asegurar una convicción son impermisibles.[38]

---

[36] Para un ejemplo de lo anterior, véase Chiesa Aponte, op. cit., Sec. 16.2(B), págs. 369-371.

[37] Smith v. Massachusetts, 543 US 462, 467 (2005) ("When a jury returns a verdict of guilty and a trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a prosecution appeal to reinstate the jury verdict of guilty"). Véase, además, LaFave, Vol. 7, pág. 39, sec. 27.3(a).

[38] Smith v. Massachusetts, *supra,* pág. 467 ("But if the prosecution has not yet obtained a conviction, further proceedings to secure one are impermissible"); United States v. Martin Linen Supply Co., *supra*, págs. 759-570 esc. 7 ("the Government's interest in preserving a conviction fairly attained obviously is far greater than its interest in investing additional time and resources in reprosecuting a defendant following a jury's failure to reach a verdict and a trial court's judgment of acquittal").

El propósito primario de la cláusula contra la doble exposición era prevenir juicios sucesivos por la misma ofensa y no que el Estado apelara o recurriera *per se*.[39] Consecuentemente, el foco de la doble exposición no es en la apelación ni la revisión que hace el tribunal apelativo, sino **en el remedio que solicita el Estado.**[40] No vemos cómo se afectan los intereses amparados por la cláusula de doble exposición cuando el Tribunal de Apelaciones emite una sentencia revocatoria y el Estado solicita que se reestablezca el dictamen de culpabilidad del foro primario. Después de todo, de conceder el petitorio del Estado, no someteríamos al acusado a un segundo juicio y, al igual que en United States v. Wilson, *supra*, y Pueblo v. Rivera Ortiz, *supra*, únicamente reestableceríamos el fallo o veredicto de culpabilidad emitido previamente.[41]

Por otro lado, cabe resaltar que la sentencia revocatoria del foro apelativo intermedio fue por una determinación procesal de que procedía suprimir la prueba de

---

[39] Sanabria v. United States, *supra*, pág. 63; United States v. Wilson, *supra*.

[40] United States v. DiFrancesco, *supra*, pág. 132 ("The double jeopardy focus, thus is not on the appeal but on the relief that is requested").

[41] Véanse además: Sanabria v. United States, *supra,* Pueblo v. Colón, Castillo, *supra*. De hecho, en Pueblo v. Santiago Collazo, 176 DPR 133 (2009), el Tribunal de Apelaciones revocó la convicción de un coacusado y lo absolvió de todos los cargos. El Estado recurrió a este Tribunal mediante *certiorari*. Atendido el caso, revocamos la sentencia del Tribunal de Apelaciones y reinstalamos el veredicto de culpabilidad y la sentencia condenatoria. Lo mismo hicimos en Pueblo v. Maisonave Rodríguez, 129 DPR 49 (1991), en el cual revocamos el dictamen del Tribunal Superior que había revocado la sentencia condenatoria emitida por el Tribunal de Distrito. Concluimos que el Ministerio Público había cumplido con su carga probatoria durante el juicio. De igual manera procedió el Tribunal Supremo federal en United States v. Aguilar, 515 US 593 (1995) (la Corte de Apelaciones revocó ambas convicciones porque la conducta imputada no estaba cubierta en el texto de la ley que establecía el delito) y United States v. Johnston, 268 U.S. 220 (1925).

identificación admitida en el juicio. Esta determinación no va dirigida a la culpabilidad o inocencia del acusado y en cualquier supuesto permite la celebración de un nuevo juicio, pues no activa la protección contra la doble exposición.[42] No vemos razón para abdicar la función revisora de este Tribunal en circunstancias en las cuales los principios rectores de la garantía constitucional no la impiden.[43]

Una evaluación sosegada de la jurisprudencia estatal y federal atinente a la garantía contra la doble exposición, así como los principios en que esta última se sustenta y motivaron su institución como un derecho fundamental, no permiten concluir que este Tribunal se vea impedido de revisar la sentencia recurrida. Extender la protección de la Cláusula de Doble Exposición a casos como este conllevaría permitirle al acusado aprovecharse del mecanismo de revisión que precisamente se había rechazado en otras instancias con el objetivo de darle finalidad al dictamen hecho por el foro primario. Sería ilógico pensar que el acusado puede apelar al foro apelativo intermedio y renunciar a su derecho a que otro juez no evalúe la corrección de la determinación del juzgador de los hechos, pero, además, le reconozcamos un derecho a que se queje ante el foro apelativo sin que el caso pueda completar todo el trámite revisor disponible. Ello tendría el

---

[42] United States v. Tateo, *supra*, pág. 465 ("The principle that [the Double Jeopardy Clause] does not preclude the Government's retrying a defendant whose conviction is set aside because of an error in the proceedings leading to conviction is well-established part of our constitutional jurisprudence").

[43] United States v. Wilson, *supra*, pág. 339 ([…] it is necessary to take closer look at the policies underlying the [Double Jeopardy] Clause in order to determine more precisely the boundaries of the Government appeal right in criminal cases").

efecto de convertir al Tribunal de Apelaciones en el foro de última instancia bajo la absoluta autoridad del acusado, a pesar de haber sido previamente convicto luego del juicio en su contra.

En consecuencia, permitir que el Estado acuda a este Tribunal mediante un recurso discrecional ——el *certiorari*—— para que reinstalemos el fallo condenatorio emitido por el juzgador de hechos no quebranta ni está en conflicto con ningún principio e interés que nuestra constitución buscó proteger. Como mencionamos, la protección contra la doble exposición no impide que el Estado recurra a este Tribunal de una decisión del Tribunal de Apelaciones que revocó la convicción de un acusado y solicite la reinstalación de la sentencia condenatoria.[44]

Atendido este asunto, procedemos a evaluar si se cometieron los errores señalados.

### III

A. *Quantum de prueba para establecer la culpabilidad de un acusado*

La Sec. 11 del Art. II de la Constitución de Puerto Rico reconoce como imperativo que en todo proceso criminal el acusado disfrute del derecho a la presunción de inocencia.[45]

---

[44] D.S. Rudstein, <u>Double Jeopardy: A Reference Guide to the United States Constitution</u>, Estados Unidos, Praeger Publishers, 2004, pág. 180 ("**the Double Jeopardy Clause does not bar the government from appealing to a higher court an intermediate appellate court's decision reversing a defendant's conviction** on the ground that the evidence relied upon by the fact finder at trial was legally insufficient to prove the defendant's guilt beyond reasonable doubt […]"). (Énfasis suplido).

[45] Const. PR, *supra,* pág. 354 ("En todos los procesos criminales, el acusado disfrutará del derecho […] a gozar de la presunción de inocencia").

Para rebatir esta presunción el ordenamiento jurídico requiere la presentación de evidencia que establezca la culpabilidad del acusado más allá de duda razonable.[46] El peso de la prueba recae en el Estado, quien deberá presentar evidencia sobre la existencia de todos los elementos del delito y su conexión con el acusado.[47] Es decir, "no basta con probar que un ser humano fue asesinado; hay que probar, además, que fue el acusado quien lo mató".[48] Esto no conlleva que la culpabilidad del acusado tenga que probarse con certeza matemática.[49] Lo que se exige es "prueba satisfactoria y suficiente en derecho, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido".[50]

La determinación de que no se cumplió con el *quantum* de prueba mencionado ──más allá de duda razonable── "es una cuestión de raciocinio, producto de todos los elementos de juicio del caso".[51] En ese sentido, la duda razonable que impide rebatir la presunción de inocencia reconocida por nuestra Constitución no es una mera duda especulativa o

---

[46] Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II; Pueblo v. García Colón I, *supra*, pág. 174; Pueblo v. Irizarry, 156 DPR 780, 786 (2002); Pueblo v. Cabán Torres, 117 DPR 645, 652 (1986).

[47] Pueblo v. García Colón I, *supra*, pág. 174; Pueblo v. Santiago Collazo, *supra*, pág. 143; Pueblo v. Rivera Ortiz, 150 DPR 457 (2000); Pueblo v. Ramos y Álvarez, 122 DPR 287, 315-316 (1988).

[48] E.L. Chiesa Aponte, Procedimiento Criminal y la Constitución: Etapa Investigativa, 1ra ed., San Juan, Ediciones Situm, 2017, pág. 197.

[49] Pueblo v. Bigio Pastrana, 116 DPR 748, 761 (1985).

[50] Pueblo v. De Jesús Mercado, 188 DPR 467, 475 (2013), sentencia; Pueblo v. García Colón I, *supra*, pág. 174-175; Pueblo v. Irizarry, *supra*, pág. 787; Pueblo v. Maisonave Rodríguez, *supra*, pág. 65; Pueblo v. Cabán Torres, *supra*, pág. 652.

[51] Pueblo v. De Jesús Mercado, *supra*, págs. 475-476; Pueblo v. Irizarry, *supra*, pág. 788.

imaginaria, o cualquier duda posible; es la insatisfacción con la prueba lo que se conoce como "duda razonable".[52]

## B. *El juzgador de los hechos como sujeto destacado en la adjudicación de la credibilidad de los testigos*

Cuando la suficiencia de la evidencia se cuestiona y se señala que el foro primario erró en su apreciación, el alcance de nuestra función revisora está limitado por consideraciones de extrema valía. No podemos perder de perspectiva que "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos".[53] Es que la norma de deferencia está más que justificada cuando el planteamiento sobre la "insuficiencia de la prueba se reduce a uno de credibilidad de los testigos". (Énfasis omitido).[54] Esto se debe a que, en cuanto a la credibilidad del testimonio prestado en el juicio, es principio inquebrantable que el foro sentenciador se encuentra en mejor posición para realizar dicha evaluación y adjudicación.[55] Conforme hemos reconocido,

> [...] no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del

---

[52] Pueblo v. De Jesús Mercado, *supra*, págs. 475-476; Pueblo v. Irizarry, *supra*, pág. 788; Pueblo v. Maisonave Rodríguez, *supra*, pág. 65; Pueblo v. Cabán Torres, *supra*, pág. 652; Pueblo v. Bigio Pastrana, *supra*, pág. 761.

[53] Pueblo v. De Jesús Mercado, *supra*, pág. 478.

[54] Íd., pág. 479; Pueblo v. Torres Rivera, 137 DPR 630, 640-641 (1994).

[55] Pueblo v. García Colón I, 182 DPR 129, 165 (2011); Pueblo v. Cabán Torres, *supra*, pág. 654.

testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, **todos estos elementos se pierden en la letra muda de las actas,** por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; **le faltará el instrumento más útil para la investigación de la verdad: la observación.** (Énfasis nuestro y comillas omitidas).[56]

Al amparo de esta premisa, en Pueblo v. García Colón I, 182 DPR 129, 165 (2011), al citar a Argüello v. Argüello, 155 DPR 62, 78 (2001), reiteramos que el juez sentenciador es ante quien deponen los testigos. Este es "**quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones** y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad". (Énfasis suplido).[57]

Así pues, como regla general, un tribunal revisor está vedado de intervenir con la adjudicación de credibilidad de los testigos, ni puede sustituir las determinaciones de hechos que a su amparo haya efectuado el foro primario basado en sus propias apreciaciones.[58] Luego de que el Tribunal de Primera Instancia ha escuchado, ponderado, valorado y determinado si cierto testimonio es creíble, debemos guiarnos por parámetros estrictos al revisar su adjudicación. En estas

---

[56] Ortiz v. Cruz Pabón, 103 DPR 939, 947 (1995).

[57] Pueblo v. García Colón I, 182 DPR 129, 165 (2011). Véase, además, Figueroa v. Am. Railroad Co., 64 DPR 335 (1994).

[58] Pueblo v. De Jesús Mercado, *supra*, pág. 478; Pueblo v. García Colón I, *supra*, pág. 165; Pueblo v. Cabán Torres, *supra*, pág. 654.

circunstancias solo procede intervenir y descartar la apreciación que realizó el juzgador sobre la credibilidad de los testigos en circunstancias que actuó movido por **pasión, prejuicio, parcialidad o que incurrió en un error manifiesto en su adjudicación.**[59] En otros términos, al revisar una determinación atinente a una convicción criminal, debemos tener presente que la apreciación de la prueba corresponde al foro sentenciador, salvo que se deba revocar porque surgió de una valoración apasionada, prejuiciada o parcializada, o su dictamen sea manifiestamente erróneo.[60]

Al respecto, en Dávila Nieves v. Meléndez Marín, 187 DPR 750 (2013), nos dimos a la tarea de definir, por primera vez, qué constituye que un juez adjudique con pasión, prejuicio o parcialidad, o que su determinación sea un error manifiesto. Expresamos que un juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna".[61] Por otro

---

[59] Pueblo v. García Colón I, *supra*, pág. 166; Pueblo v. Bonilla Romero, 120 DPR 92, 111 (1987) ("este Tribunal *no* intervendrá con la apreciación y adjudicación de credibilidad que en relación con la prueba testifical haya realizado el juzgador de los hechos a nivel de instancia *en ausencia* de pasión, prejuicio, parcialidad o error manifiesto. Dicha determinación, como es sabido, es *merecedora de gran deferencia* por parte del tribunal apelativo *por cuanto* es ese juzgador quien, de ordinario, está en *mejor posición* para aquilatar la prueba testifical desfilada *ya que* él fue quien oyó y vio declarar a los testigos".); Pueblo v. Cabán Torres, *supra*.

[60] Pueblo v. Santiago Collazo, *supra*, págs. 147-148; Pueblo v. Irizarry, *supra*, pág. 789.

[61] Dávila Nieves v. Meléndez Marín, 187 DPR 750, 782 (2013).

lado, enunciamos que se consideran claramente erróneas las conclusiones del foro revisado "si de un análisis de la totalidad de la evidencia, este Tribunal queda convencido de que se cometió un error, […] [porque] las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida".[62] Es decir, consideramos que se incurre en un error manifiesto cuando "la apreciación de esa prueba **se distancia de la realidad fáctica o es inherentemente imposible o increíble**". (Énfasis suplido).[63]

Este estándar de revisión, por ejemplo, restringe nuestra facultad para sustituir el criterio del foro primario a escenarios en que de la prueba admitida **no exista base suficiente que apoye tal determinación**.[64] Claro está, en lo que respecta al testimonio vertido en el juicio, la inexistencia de base suficiente que apoye la determinación y, consecuentemente, sostenga la validez del dictamen emitido por el foro primario no son un asunto de cantidad. Es un análisis enfocado en la credibilidad que otorgó el juzgador de los hechos al o a los testigos que tuvo ante sí. Debemos recordar que nuestro sistema probatorio y procesal no requiere de un número específico de testigos para probar la culpabilidad de un acusado más allá de duda razonable. El juzgador tampoco "tiene la obligación de decidir de acuerdo

---

[62] Íd., pág. 772, al citar a <u>Abudo Servera v. A.T.P.R.</u>, 105 DPR 728, 731 (1977).

[63] <u>Pueblo v. Irizarry</u>, *supra,* pág. 816.

[64] Íd.

con las declaraciones de cualquier cantidad de testigos que no le convenzan contra un número menor u otra evidencia que le resulte más convincente".[65] Por el contrario,

> el testimonio de un testigo principal, por sí solo, de ser creído, es suficiente en derecho para sostener un fallo condenatorio, **aun cuando no haya sido un testimonio "perfecto"**, pues "[e]s al **juzgador de los hechos** a quien le corresponde resolver la credibilidad de un testigo cuando haya partes de su testimonio que no sean aceptables [...]".[66]

En virtud de todo lo anterior, son innumerables las instancias en que este Tribunal ha rechazado la intervención de un foro judicial revisor en la apreciación de la prueba efectuada por el juzgador de los hechos. Véase, e.g., Pueblo v. De Jesús Mercado, 188 DPR 467 (2013); Pueblo v. Santiago Collazo y otros, 176 DPR 133 (2009); Pueblo v. Figueroa Jaramillo, 170 DPR 932 (2007) (opinión de conformidad del Juez Asociado señor Rivera Pérez); Pueblo v. Roldán López, 158 DPR 54 (2002); López Vicil v. ITT Intermedia, Inc., 142 DPR 857 (1997); Pueblo v. Maisonave Rodríguez, 129 DPR 49 (1991); Pueblo v. Rodríguez Román, 128 DPR 121 (1991); Pueblo v. Cabán Torres, 117 DPR 645 (1986).

Recientemente, en Pueblo v. De Jesús Mercado, *supra*, revocamos una sentencia del Tribunal de Apelaciones que invalidó una determinación de culpabilidad del Tribunal de Primera Instancia por el delito de agresión. El foro apelativo fundamentó su dictamen en la poca credibilidad del testimonio

---

[65] Regla 110(e) de Evidencia, 32 LPRA Ap. VI.

[66] Pueblo v. De Jesús Mercado, *supra*, págs. 476-477; Pueblo v. Chévere Heredia, 139 DPR 1, 15-16 (1995).

vertido en el juicio por el testigo principal de cargo.[67] En específico, se trataba de un agente del orden público que arrestó a un manifestante por alteración a la paz y agresión en su modalidad menos grave.[68] El foro apelativo intermedio catalogó el testimonio del agente como un testimonio estereotipado que no le merecía credibilidad y revocó la convicción en cuanto al delito de agresión.[69]

Una vez el caso llegó ante nuestra consideración, aunque reconocimos ciertas inconsistencias en el testimonio del agente del orden público que sirvió como testigo de cargo, al hacer referencia a Pueblo v. Cabán Torres, *supra*, págs. 656-657, expresamos que,

> de acuerdo con la norma jurisprudencial aplicable, […] era precisamente al foro sentenciador a quien le correspondía dirimir esas discrepancias y así lo hizo. Recordemos que cuando un testigo se contradice, lo que se pone en juego es su credibilidad y es al jurado o al juez de instancia a quien corresponde resolver el valor de su restante testimonio. (Comillas omitidas).[70]

Resolvimos que el tribunal apelativo "abusó de su discreción al sustituir el criterio de apreciación de la prueba del juez sentenciador".[71] Señalamos que el apelante no alegó actuación alguna por parte del Tribunal de Primera Instancia que estuviera motivada por parcialidad, pasión, prejuicio o constituyera un error manifiesto.[72] Por tanto, las

---

[67] Pueblo v. De Jesús Mercado, *supra*, pág. 474.

[68] Íd., pág. 468.

[69] Íd.

[70] Íd., págs. 485-486.

[71] Íd., pág. 468.

[72] Íd., pág. 484.

circunstancias no justificaban que el Tribunal de Apelaciones interviniera con el criterio del foro primario.[73]

De igual manera, en Pueblo v. Maisonave Rodríguez, supra, invalidamos la sentencia de un Tribunal Superior, que a su vez revocaba una sentencia criminal del entonces Tribunal de Distrito. Luego de celebrarse el juicio se había encontrado culpable al Sr. Gilberto Maisonave Rodríguez de cometer el delito de incumplimiento con la obligación de alimentar. El fundamento del Tribunal Superior para sustituir el criterio del Tribunal de Distrito fue su insatisfacción con la prueba y el poco crédito que atribuyó a algunos testimonios presentados. En particular, la prueba de cargo que el Tribunal Superior consideró insuficiente, o poco creíble, se dirigía a probar la paternidad de un menor, un elemento del delito. La evidencia consistió en dos cosas: (1) el resultado de la prueba de sangre utilizada para comprobar paternidad, y (2) el testimonio de la madre del menor.[74] En esa ocasión, desglosamos el alcance de la función revisora y resolvimos que como único procedía revocar al tribunal sentenciador era que la prueba fuera insuficiente para establecer la culpabilidad más allá de duda razonable.[75] Luego de examinar en detalle la evidencia de cargo y los elementos del delito, concluimos que se habían probado todos los elementos del delito. Ausente el fallo condenatorio de algún elemento de parcialidad, pasión o prejuicio de parte del juzgador de los

---

[73] Íd., pág. 486.

[74] Pueblo v. Maisonave Rodríguez, supra, pág. 61.

[75] Íd., págs. 62-63.

hechos, resolvimos que erró el Tribunal Superior al revocar la sentencia del Tribunal de Distrito.[76]

Más aún, hace casi tres décadas, en Pueblo v. Rodríguez Román, *supra*, se acusó a un individuo por la comisión de varios delitos en horas de la noche. Cuatro días después de los hechos, la principal testigo de identificación observó al hermano del acusado e indicó que se parecía al autor de los delitos. Sin embargo, ese mismo día, mientras estaba en el cuartel de la policía, observó al acusado al lado de un teléfono y lo señaló como el autor de los delitos. La testigo también lo identificó durante el juicio. La defensa intentó impugnar la credibilidad de la testigo basándose en ciertas contradicciones en el testimonio prestado en el juicio. Correctamente nos abstuvimos de sustituir el criterio del juzgador de los hechos. Concluimos que se trataba de un asunto de credibilidad que correspondía resolver a este último y que la totalidad de la prueba desfilada, creída por el jurado, sostenía la confiabilidad de la identificación en ausencia de pasión, prejuicio, parcialidad o error manifiesto.[77]

"Todo lo anteriormente expresado, sin embargo, no significa que esa determinación de culpabilidad realizada por el juzgador de los hechos constituye una barrera insalvable".[78] Si luego de seguir los criterios que hemos enunciado surge de la prueba duda razonable y fundada sobre la culpabilidad del acusado, no hemos vacilado en dejar sin

---

[76] Íd., págs. 70-71.

[77] Pueblo v. Rodríguez Román, 128 DPR 121, 129 (1991).

[78] Pueblo v. Cabán Torres, *supra*, pág. 655.

efecto un fallo condenatorio.[79] Siempre, claro está, debemos ser cuidadosos, pues "la intervención indiscriminada con la adjudicación de credibilidad que se realiza a nivel de instancia, significaría el caos y la destrucción del sistema judicial existente en nuestra jurisdicción".[80]

**C. _La prueba de identificación del autor del delito: la supresión y el valor probatorio_**

En aquellas ocasiones en que la víctima o el testigo ocular de un delito no conozcan a la persona que lo cometió, nuestro sistema procesal penal provee para la identificación, en la etapa investigativa, mediante rueda personal de detenidos o por el examen de fotografías. La Regla 252 de Procedimiento Criminal, _supra_, rige estos procesos.

Por su efecto sobre el debido proceso de ley, un acusado puede solicitar la supresión de una identificación fundamentado en la sugestividad del proceso, en su falta de confiabilidad o en ambas cosas.[81] No obstante, reiteradas veces este Tribunal ha establecido que la supresión requiere un análisis caso a caso de la identificación que permita sopesar la totalidad de las circunstancias que la rodean.[82] Entre los factores que se deben considerar al evaluar la

---

[79] Íd., al citar a Pueblo v. Alamo Alamo, 116 DPR 673 (1985); Pueblo v. Sanabria Pérez, 113 DPR 694 (1983); Pueblo v. Pagán Díaz, 111 DPR 609 (1981); Pueblo v. Falú Fuentes, 102 DPR 809 (1974); Pueblo v. Meléndez Rolón, 100 DPR 734 (1972); Pueblo v. Carrasquillo Carrasquillo, 102 DPR 545 (1974).

[80] Pueblo v. Cabán Torres, _supra_, pág. 648,

[81] Pueblo v. Hernández González, 175 DPR 274, 298-299 (2009); Pueblo v. Rodríguez Maysonet, 119 DPR 302, 309 (1987).

[82] Pueblo v. Hernández González, _supra_, pág. 290; Pueblo v. Mejías Ortiz, 160 DPR 93, 93 (2003); Pueblo v. Rodríguez Román, 128 DPR 121, 127-28 (1991); Pueblo v. Ortiz Pérez, 123 DPR 216, 223-24 (1989); Pueblo v. Peterson Pietersz, 107 DPR 172, 183 (1978).

validez y la confiabilidad de una identificación, hemos pautado los siguientes: (1) la oportunidad que tuvo el testigo de ver al autor del delito durante la comisión del mismo; (2) el grado de atención del testigo; (3) la precisión de la descripción del perpetrador que hizo el testigo; (4) el grado de certeza que demuestre el testigo durante la rueda de detenidos, y (5) el lapso de tiempo que transcurrió entre el crimen y la identificación.[83]

Ahora bien, en Pueblo v. Rey Marrero, 109 DPR 739, 750 (1980), resolvimos que la Regla 234 de Procedimiento Criminal, *supra*, establece que **la moción para suprimir evidencia de identificación de un acusado como autor de un delito debe presentarse por lo menos <u>cinco días antes</u> del comienzo del juicio**. Trascurrido este plazo, como excepción, la supresión de la identificación puede peticionarse solo si está presente alguna de tres circunstancias, a saber: (1) que se demostrare la existencia de justa causa para no haberla presentado dentro de ese término, (2) que al acusado no le constaran los fundamentos de la moción, o (3) que la ilegalidad de la obtención de la prueba, es decir, su inadmisibilidad surgiere de la prueba del fiscal.[84] Corresponde a la defensa poner en condiciones al tribunal de que amerita y exige que se permita reproducir la moción de

---

[83] Pueblo v. Hernández González*, supra,* págs. 291-92; Pueblo v. Mejías*, supra,* pág. 93; Pueblo v. Peterson Pietersz*, supra,* pág. 183.

[84] Regla 234 de Procedimiento Criminal, *supra*; Pueblo v. Rey Marrero, 109 DPR 739, 750 (1980); D. Nevares-Muñiz, Sumario de Derecho Procesal Penal Puertorriqueño, 9na edición, 2011, Instituto para el Desarrollo del Derecho Inc., pág. 34.

supresión de la prueba.[85] En ausencia de alguno de estos escenarios, el tribunal, por ser una de las facultades inherentes a su función judicial, no está impedido de otorgar el valor probatorio que considere apropiado a la identificación en virtud de la totalidad de las circunstancias y la confiabilidad que a éste le merezca. Para ello, al adjudicar su valor probatorio, puede tomar en consideración los **criterios de oportunidad, atención, precisión, certeza y memoria** mencionados que inciden directamente sobre la confiabilidad de la identificación.[86]

No obstante, es imprescindible no alejarnos del estándar de deferencia que hemos elaborado cuando la evaluación de estos principios está atada a la credibilidad de los testigos.[87] En esas circunstancias es patente que son aplicables en toda su extensión los fundamentos que nos han llevado a conceder deferencia a la determinación del foro sentenciador. Por tanto, como cuestión de umbral, debemos evaluar si el valor probatorio conferido a lo declarado por el testigo, y por consiguiente a la identificación, fue producto de la pasión, el prejuicio o la parcialidad del juzgador, o si constituyó un error manifiesto.[88]

---

[85] Pueblo v. Martínez Torres, *supra*, pág. 574.

[86] Pueblo v. Hernández González, *supra,* pág. 299.

[87] Véase íd., pág. 297; Pueblo v. Mejías Ortiz, *supra*; Pueblo v. Rodríguez Román, 128 DPR 121, 128 (1991) (("[L]a conclusión del juzgador de hechos sobre la suficiencia de prueba confiable para la identificación de un acusado tiene todo el respeto y validez que ordinariamente se extiende a las determinaciones de hechos").

[88] Pueblo v. Hernández González, *supra*, pág. 297. Al analizar a Pueblo v. Suárez Sánchez, 103 DPR 10 (1974); Pueblo v. Ortiz Pérez, *supra*, y a Pueblo v. Mattei Torres, 132 DPR 18 (1992), expresamos que "el tribunal había admitido la prueba que posteriormente fue presentada y aquilatada en el juicio. La impugnación de la identificación de los

**IV**

El examen de los autos, en total cumplimiento con los criterios establecidos por nuestra jurisprudencia, demuestra que los errores que señaló la Oficina del Procurador General se cometieron. En esencia, en el Tribunal de Apelaciones el recurrido cuestionó la apreciación de la prueba presentada en el juicio. Los errores que señaló se centraron en impugnar el valor probatorio de la identificación del señor Toro Martínez como autor de los delitos imputados.[89] Empero, **sin que fuera planteado en el Tribunal de Primera Instancia,** el foro apelativo intermedio decidió suprimir la identificación del recurrido cuando ni siquiera estaban presentes los fundamentos indispensables que la hicieran inadmisible. La facultad del Tribunal de Apelaciones, como foro revisor, estaba limitada a evaluar los errores señalados y, por consiguiente, el valor probatorio de la identificación y la suficiencia de la prueba presentada en el juicio. Veamos.

---

acusados en todos esos casos se presentó después de recaída la sentencia. Por eso, **para revocar la apreciación del juzgador de los hechos en cuanto al peso o la credibilidad de esa prueba era necesario demostrar prejuicio, parcialidad o error manifiesto**". (Énfasis suplido).

[89] Los errores señalados en el Tribunal de Apelaciones fueron los siguientes:

A) ERRÓ EL HONORABLE TRIBUNAL AL ENTENDER QUE EL ACUSADO ES CULPABLE MÁS ALLÁ DE TODA DUDA RAZONABLE.

B) ERRÓ EL HONORABLE TRIBUNAL AL ENTENDER QUE LA PRUEBA PRESENTADA ES CONFIABLE Y SUFICIENTE PARA LLEGAR A UNA CONVICCIÓN A PESAR DE LAS INCONSISTENCIAS EN LOS TESTIMONIOS.

C) ERRÓ EL HONORABLE TRIBUNAL AL DAR CREDIBILIDAD AL TESTIGO P[R]INCIPAL, POR ENTENDER QUE NO SURGIÓ DE LA PRUEBA MOTIVACIÓN PARA MENTIR.

D) ERRÓ EL HONORABLE TRIBUNAL AL IMPONER LA PENA DEL ART. 5.04 DE LA LEY DE ARMAS EN VIOLACIÓN AL DEBIDO PROCESO DE LEY. Véase Apéndice, págs. 23-24.

A. *Prueba testifical presentada en el Tribunal de Primera Instancia sobre la identificación del acusado*

En virtud de la controversia que resta resolver, nos limitaremos a exponer el testimonio del señor Feliciano Jácome, la señora Pérez Morales y el agente Torres Cruz.

En el juicio se presentó evidencia que establecía que el Sr. Julián Vélez Vega (señor Vélez Vega o víctima) había muerto de un disparo en la cabeza tras una persona intentara robar en su negocio "Juliancito Gas Services". Los dos testigos que observaron a la persona que mató a la víctima fueron la señora Pérez Morales y el señor Feliciano Jácome. Ahora bien, el testigo principal que conectó al señor Toro Martínez con la comisión de los delitos imputados fue el señor Feliciano Jácome, quien lo identificó como su autor durante la rueda de detenidos celebrada el 24 de febrero de 2012. Es decir, tres días después de los hechos que dieron lugar a las acusaciones contra el recurrido. Cabe destacar, además, que el señor Toro Martínez fue identificado por el señor Feliciano Jácome durante el juicio como la persona que el testigo vio en el negocio de la víctima el día de los hechos.

Conforme surge del testimonio del señor Feliciano Jácome, el cual mereció entero crédito al Tribunal de Primera Instancia, la mañana de los hechos este realizaba labores de limpieza en la acera al otro lado de la calle que se encuentra frente al negocio de la víctima. Desde su ubicación pudo observar el rostro descubierto del señor Toro Martínez en,

como mínimo, dos ocasiones.[90] Primero, lo vio caminar de frente por la acera que está ubicada en el lado que sitúa el negocio del señor Vélez Vega. La segunda ocasión, lo observó luego de que el señor Toro Martínez cometiera el asesinato y se quitara la capucha que le cubría el rostro al salir del negocio. Afirmó que en esta última ocasión **se miraron el uno al otro directamente por varios segundos.**

En particular, el testigo narró en detalle lo que notó frente a Juliancito Gas Services, desde lo que hizo un cliente que salió del negocio antes de que se suscitara el asesinato, hasta el camino que siguió y los movimientos que realizó el señor Toro Martínez al salir del negocio del señor Vélez Vega.[91] Explicó que se encontraba barriendo frente al lugar donde ocurrió el crimen y vio al señor Toro Martínez, por primera vez, aproximadamente a ochenta pies cuando bajaba la cuesta frente al negocio de la víctima y que en ese momento no tenía nada cubriéndole el rostro.[92] Asimismo, declaró que el joven que observó caminar por la acera y la persona que luego salió encapuchada del referido establecimiento eran la misma persona y que tenían la misma ropa: "*t-shirt* de franjas amarillas y negras".[93] Expresó que, varios segundos después de que escuchó una detonación, observó cuando el señor Toro Martínez salía del establecimiento encapuchado y que, luego

---

[90] Transcripción, íd., págs. 181-182.

[91] Íd., págs. 181-189.

[92] Íd., pág. 183 ("Bueno en ese momento no tenía nada cubriéndole la, el rostro cuando venía caminando por la acera") y 231 ("Cuando venía bajando yo le vi el rostro").

[93] Íd., págs. 186 y 207 ("Hasta que sale del negocio la misma persona, el mismo rostro").

de quitarse lo que llevaba en el rostro, se miraron.[94] Aclaró que se mantuvo mirándolo directamente cuando se paró en la puerta del negocio y salió de este. Añadió que cuando este último salió del negocio, "[e]n ese preciso momento fue cuando más cerca" vio su rostro.[95] Describió que el objeto que utilizaba para taparse la cara cuando salió del negocio era color verde oscuro y se trataba de un hombre delgado y blanco. **Aseguró que pudo observarle el rostro durante varios segundos y que jamás lo olvidaría.**[96] De igual manera, afirmó que el individuo salió y caminó en dirección al centro del pueblo de Yauco.[97]

El señor Feliciano Jácome participó en un total de cinco ruedas de identificación. Conforme declaró en el juicio, **éste no había identificado definitivamente a ninguna de las personas como autora del delito.** Aunque la defensa intentó establecer que en las ruedas de fotografías se identificó a otra persona en dos ocasiones, cabe mencionar que el señor Feliciano Jácome sostuvo, en repetidos momentos, que en estas nunca identificó a alguna persona, sino que había una persona que "**se parecía, pero no era**".[98] Sobre este particular recalcó que así siempre se lo aclaró al agente José Torres Cruz.

---

[94] Íd., págs. 185 ("Me miró y yo lo miré"; "Pero yo me le quedé mirando"; "nos miramos de frente los dos") y 205 ("Yo me le quedé mirando").

[95] Íd., pág. 205 ("En ese preciso momento fue cuando más cerca se lo vi yo [el rostro]".).

[96] Íd., pág. 193 ("Este… (…) el rostro del acusado jamás y nunca se me olvidará en la vida. Mientras yo tenga buena memoria. Jamás y nunca se me olvidará el rostro del acusado mientras yo tenga buena memoria. […]").

[97] Íd., pág. 186.

[98] Véase, e.g., íd., págs. 190 ("La primera confrontación de fotos después de observarla detenidamente y le indico al Agente José Torres que

En la primera rueda de detenidos, no se identificó a ninguna persona. Por su parte, en la segunda rueda el señor Feliciano Jácome tardó, únicamente, treinta segundos para identificar al señor Toro Martínez. Con ello, de todos los individuos que tuvo ante sí, éste identificó al recurrido como el autor del delito. De hecho, a preguntas del Ministerio Público, el señor Feliciano Jácome declaró lo siguiente: "[l]uego de observarlos detenidamente, yo le indiqué al Agente José Torres que el sujeto número uno era la persona que yo había visto ese día en el [sic] escena del crimen. El cual está sentado allí, a la mano derecha de su abogado".[99] En ese momento, el testigo identificó de nuevo al señor Toro Martínez como el autor de los delitos.

Por su parte, el testimonio de la señora Pérez Morales corroboró en gran medida lo expresado por el señor Feliciano Jácome. Esta declaró, en lo pertinente, que la carretera frente al negocio de la víctima tenía dos carriles, uno en cada dirección. Señaló, además, que desde su escritorio se podía observar "bastante bien" el lugar donde se encontraba la víctima en el momento que le quitaron la vida. Además, sostuvo que momentos antes de los hechos, la víctima había atendido a un cliente. Expresó que la persona que mató a su

---

la foto número dos se parecía al sujeto que yo había visto salir de la escena del crimen, pero que no era"), 221 ("Dije que [se] parecía, pero que no era él"), 233 ("Yo dije que se parecía"), 234 ("[…] yo dije que, que no era"), 235 ("Yo le dije que se parecía, pero que no era") y 236 ("Pues este, yo dije que se parecía pero que no era") . Véase además: íd., págs. 223 ("Yo en ningún momento dije que la foto número dos correspondía a la persona") y 224 ("Yo dije que [se] parecía, pero que no era").

[99] Íd., pág. 193. Se hizo constar que el testigo había identificado al señor Toro Martínez en el juicio. Íd.

jefe era delgado, de tez blanca, más o menos de la estatura de su jefe y de cabello castaño; que llevaba una máscara color oscuro y gafas; y vestía una polo oscura con líneas y un pantalón corto, "de esos que parecen largos". Declaró que no lo vio esconder el arma por la forma en que estaba posicionado el individuo al momento de pararse en la salida del establecimiento, pero que salió caminando del negocio en dirección al pueblo de Yauco.

Ciertamente, las declaraciones de ambos testigos no fueron exactas, pues contenían diferencias atribuibles en gran medida a aspectos de la percepción de los testigos. Sin embargo, lo revelado reafirmaba aquellos aspectos del testimonio del señor Feliciano Jácome que demostraban que había estado frente al negocio de la víctima y observado al autor de delito. De hecho, coincidieron en la gran mayoría de las características y las circunstancias del incidente.

En el caso del Agente José Torres Cruz (agente Torres Cruz), más que confligir lo expuesto por el principal testigo de identificación, su testimonio ratificó gran parte de lo esbozado por este último durante el juicio. El agente Torres Cruz reafirmó que el señor Feliciano Jácome había hecho la salvedad siempre de que, aunque uno de los individuos en la rueda de detenidos **se parecía, no era la persona** que él había visto.[100] Al respecto es preciso reproducir a continuación

---

[100] Íd., págs. 291-292, 324 y 337-338.

varias partes de lo declarado por el agente Torres Cruz en el
juicio:

| | |
|---|---|
| **Fiscal:** | Mire, ¿por qué usted pone que identifica al número dos? |
| **Testigo 6:** | Porque es la persona que él me señala. |
| **Fiscal:** | Aja. |
| | ¿Y qué fue lo que [é]l le indicó con relación a la persona que le señaló [a] usted? |
| **Defensa:** | No, hay reparo porque es sugestiva la pregunta, Juez. |
| **Juez:** | Con lugar. |
| **Fiscal:** | ¿Qué hace don Hipólito luego de identificarle ese número dos a usted? |
| **Testigo 6:** | Me dice que esta no es la persona. |
| **Fiscal:** | Que esa no es la persona. |
| | ¿Y por qué usted pone que fue el número dos que identifica? |
| **Testigo 6:** | Sí porque hay otra parte donde dice, que este no corresponde o corresponde al número asignado a la fotografía del sospechoso.[101] |

Más adelante, el agente Torres Cruz reiteró lo expresado
al inicio de su testimonio:

| | |
|---|---|
| **Juez:** | Fiscal, re-directo. |
| **Fiscal:** | Muy buenas tardes, fiscal Ernesto Quesada. |
| | Ayer el compañero le hizo una pregunta y yo quiero que usted me indique cuál fue la contestación que usted dio a la pregunta del compañero con relación a por qué no se acusó a Alex Rodríguez Colón. ¿Cuál fue la contestación que usted indicó? |
| **Testigo 6:** | **Porque el señor Hipólito eh, Feliciano Jácome me indicó de que esa no era la persona.** |

―――――――――――――――――
[101] Íd., págs. 291-292. Véase además: íd., pág. 324.

| | |
|---|---|
| **Fiscal:** | Uhum. Que esa no era la persona. |
| **Testigo:** | **No era la persona que había cometido el asesinato.** |
| **Fiscal:** | Okay. |
| | Ninguna otra pregunta Juez. |
| **Defensa:** | Si nos permite Juez. |
| | ¿Hay algún documento donde haga constar eso que usted acaba de manifestarle a la, al fiscal? |
| **Testigo 6:** | En la parte posterior de, de la rueda de confrontación. |
| **Defensa:** | Por eso, en esa parte posterior de la confrontación usted hace alguna anotación donde diga, verdad otras palabras, se me parece, pero no es. |
| **Testigo 6:** | No. |
| **Defensa:** | Verdad que no. Ni si… ni siquiera existe otro documento aparte con algunas notas o una declaración jurada suya donde usted indique eso. |
| **Testigo 6:** | No, esa, esa aseveración no. |
| **Defensa:** | La aseveración usted lo dice verdad de forma verbal hoy. Hoy y las vistas. |
| **Testigo 6:** | Es correcto. Pero es l[o] que me indica a mí el testigo.[102] |

Con ello el agente Torres Cruz aclaró que, aunque omitió incluirlo en el acta de la rueda de fotografías, el señor Feliciano Jácome sí le había indicado que la persona en la foto se parecía, pero no era el autor del asesinato.

Culminada la presentación de la prueba y luego de escuchar los planteamientos finales de las partes, el Tribunal de Primera Instancia señaló lo siguiente:

**En este caso el Tribunal no tiene ante sí una Supresión de Identificación, sino un juicio en sus méritos.**

---

[102] Íd., págs. 337-338.

Hemos evaluado todos los exhibits sometidos por las partes a medida que el caso ha ido desfilando ante nuestra consideración. Sobre todo hemos hecho hincapié en las actas sobre rueda de confrontación sometidas por la Defensa. Eh, de las mismas el Tribunal obviamente puede hacer una serie de inferencias razonables a los […] efectos del testimonio vertido por el Sr. Hipólito Feliciano Jácome con la fotografía número siete en el exhibit B de la Defensa. Y por la fotografía dos en el exhibit A de la Defensa. Y eh, la rueda de confrontación a la que se sometió el Sr. Giovanny Toro Martínez y la identificación en sala.

Como en un momento dado argumentó entiendo el Ministerio Público[,] el Tribunal lleva mucho tiempo viendo casos criminales. De alguna manera nunca había tenido ante la consideración del Tribunal las diferentes facetas. Un testimonio como el del Sr. Hipólito Feliciano Jácome entre las cosas que el Tribunal toma en consideración es la motivación que puede tener una persona para venir a mentir al tribunal. **No encontramos ninguna.**

Eso unido al resto de la prueba nos hace concluir que Don Giovanny Toro Martínez es culpable en ambos casos. Se emite eh, fallo a esos efectos. […]. (Énfasis suplido).[103]

**V**

El foro primario escuchó, analizó y justipreció el testimonio del señor Feliciano Jácome. Tras ese ejercicio, le confirió valor probatorio suficiente para sostener la culpabilidad del señor Toro Martínez. Así, a pesar de las preguntas y los argumentos presentados por los abogados de la defensa con el objetivo de impugnar a los testigos de cargo, el juzgador, al sopesar su testimonio junto a la demás prueba admitida, otorgó total credibilidad al testimonio del señor Feliciano Jácome.

Cabe preguntarnos lo siguiente: ¿Es, en efecto, inherentemente imposible o irreal que el señor Feliciano

---

[103] Íd., pág. 379.

Jácome identificara al autor del asesinato? ¿Resulta tan inverosímil que el Tribunal de Primera Instancia otorgara confiabilidad a la identificación y al testimonio del testigo como para revocar el fallo de culpabilidad y, por consiguiente, la sentencia condenatoria? Ineludiblemente, debemos contestar estas interrogantes en la negativa.

Ciertamente la descripción de los testigos de cargo no fue perfecta, pues existen ciertas variaciones en relación a la estatura y la forma en que describió el cabello. Sin embargo, la totalidad de la descripción y seguridad al momento de identificarlo, de haber sido creído su testimonio por el juzgador, unido a las demás circunstancias, era suficiente para sostener la conexión del acusado con el asesinato del señor Vélez Vega. Debemos recordar que, de todas las personas que tuvo ante sí en las ruedas, según declaró el testigo, la única persona que el señor Feliciano Jácome identificó afirmativamente fue al señor Toro Martínez. Además, surge de su declaración que este tuvo oportunidad amplia de observarlo directamente, antes y después de la comisión de los delitos.

El valor probatorio que el juzgador de los hechos adjudicó a la identificación no dependió solo de la sugestividad o no del proceso. La totalidad de las circunstancias que rodean la identificación, las cuales incluyen lo ocurrido el día de los hechos delictivos, permitió sopesar al juzgador de los hechos la confianza que esta merecía.

Reemplazar el criterio del juzgador de los hechos exigía que de los autos emanara una actuación apasionada, prejuiciada, parcializada o un error manifiesto. No existen razones para que este Tribunal concluyera que el Tribunal de Primera Instancia incurrió en ellas.[104] La prueba, por el contrario, sustentaba debidamente el fallo emitido. Por ello era forzoso concluir que el Ministerio Público probó, más allá de duda razonable, todos los elementos del delito y la conexión de estos con el acusado. El caso ante nos no permite sustituir ese criterio.

## VI

Por los fundamentos expuestos, *revocamos la sentencia recurrida emitida por el Tribunal de Apelaciones y reinstalamos la sentencia condenatoria emitida por el Tribunal de Primera Instancia. Se devuelven los autos del caso al Tribunal de Primera Instancia para que proceda conforme con lo aquí expresado y ordene inmediatamente el ingreso a prisión del señor Toro Martínez, de este encontrarse en libertad.*

*Se dictará sentencia de conformidad.*

Edgardo Rivera García
Juez Asociado

---

[104] Preocupa sobremanera que algunos compañeros se atribuyan la facultad de disminuir la credibilidad de los testigos por meras inconsistencias y se adentren en una adjudicación que, a la luz de las circunstancias del caso, no se justificaba.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Giovanny Toro Martínez<br><br>Recurrido | CC-2014-0630 | |

**SENTENCIA**

En San Juan, Puerto Rico, a 6 de agosto de 2018.

Por los fundamentos expuestos en la Opinión que antecede, los cuales se hacen formar parte de esta Sentencia, revocamos la sentencia recurrida emitida por el Tribunal de Apelaciones y reinstalamos la sentencia condenatoria emitida por el Tribunal de Primera Instancia. Se devuelven los autos del caso al Tribunal de Primera Instancia para que proceda conforme con lo aquí expresado y ordene inmediatamente el ingreso a prisión del señor Toro Martínez, de este encontrarse en libertad.

Lo acordó y manda el Tribunal y certifica el Secretario del Tribunal Supremo.

La Juez Asociada señora Rodríguez Rodríguez concurre sin opinión escrita. El Juez Asociado señor Colón Pérez concurre con el resultado sin opinión escrita. La Jueza Presidenta Oronoz Rodríguez emitió una opinión disidente a la cual se unió el Juez Asociado señor Estrella Martínez.


Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

      v.

CC-2014-0630

Giovanny Toro Martínez

    Recurrido

Opinión disidente emitida por la Jueza Presidenta Oronoz Rodríguez a la cual se unió el Juez Asociado señor Estrella Martínez

En San Juan, Puerto Rico, a 6 de agosto de 2018.

Determinar si una persona cometió un delito más allá de duda razonable es una de las tareas más difíciles que tiene que atender un tribunal. De ordinario, le damos deferencia al juzgador de los hechos en cuanto a la apreciación de la prueba que tuvo ante su consideración. Sin embargo, nos encontramos ante una situación de hechos que demuestra la razón por la cual esa deferencia no es absoluta. En este caso el foro primario emitió una sentencia condenatoria, a pesar de que: (1) el único testigo que conecta al acusado con el crimen identificó en dos ruedas de fotografías a **otra persona** como el autor de los hechos, (2) los testimonios de los dos testigos principales son

inconsistentes y (3) la rueda de detenidos no fue idónea. En una situación como esta, le correspondía a este Tribunal, como foro de última instancia, intervenir con la determinación del foro primario y corregir el error de derecho.

Al resolver lo contrario, el Tribunal ignora el valor probatorio que tienen las actas de confrontación, dispensa al Estado de su deber de probar el caso más allá de duda razonable y renuncia a evaluar si la prueba que se presentó produce certeza o convicción moral de que el Sr. Giovanny Toro Martínez cometió el delito imputado. Por entender que el Estado no probó más allá de duda razonable la culpabilidad del señor Toro Martínez, no puedo estar en mayor desacuerdo con una Mayoría de este Tribunal y, por lo tanto, disiento.

I

El 21 de febrero de 2012, el Sr. Julián V. Vélez Vega fue asesinado de un disparo mientras se encontraba en su negocio de venta de gas conocido como "Juliancito Gas", ubicado en el Municipio de Yauco. Luego de los trámites preliminares, el Ministerio Público presentó dos acusaciones contra el señor Toro Martínez. Una por violación al Artículo 106(b) del Código Penal de Puerto Rico de 2004 por el delito de asesinato en primer grado en su modalidad de asesinato estatutario, y otra por violación al Artículo 5.04 de la Ley de Armas de Puerto Rico, 25 LPRA sec. 458(c), por el delito de portación y uso de armas de fuego sin licencia. Celebrado el juicio mediante tribunal de derecho, el Tribunal de Primera Instancia encontró

al señor Toro Martínez culpable de los delitos imputados y emitió un fallo condenatorio.

Durante el juicio testificaron las siguientes personas: (1) la Sra. Midalis Ortiz Rodríguez, viuda del señor Vélez Vega; (2) la Sra. Maribel Pérez Morales, empleada de "Juliancito Gas" que estuvo presente al momento de los hechos; (3) el Sr. Hipólito Feliciano Jácome, empleado del Municipio de Yauco que realizaba trabajos de limpieza cerca de Juliancito Gas el día de los hechos y quien único identificó al señor Toro Martínez como el autor del delito; (4) el Agente Alexis Caraballo Santiago, policía municipal que acudió a la escena del crimen; (5) el Sr. Edwin Pérez Benítez, experto en balística, y (6) el Agente José Torres Cruz, policía estatal que investigó la escena del crimen y los hechos del caso. Por su parte, la defensa presentó el testimonio del Sr. Amady Toro Pacheco, padre del señor Toro Martínez.

Por su pertinencia a la controversia, describiré en detalle los testimonios ofrecidos durante el juicio por la señora Pérez Morales y el señor Feliciano Jácome, quienes estuvieron en la escena del crimen o sus proximidades al momento de los hechos, y el testimonio del agente Torres Cruz, quien acudió a la escena del crimen para investigar los hechos.

A. Testimonio de la Sra. Maribel Pérez Morales.

La señora Pérez Morales testificó que para la fecha de los hechos trabajaba en Juliancito Gas, propiedad de la

víctima.[105] Señaló que, a eso de las 11:00 de la mañana del día de los hechos, el señor Vélez Vega llegó al negocio y procedió a atender a un cliente que ella había estado ayudando.[106] La señora Pérez Morales regresó a su escritorio para continuar trabajando otros asuntos. La testigo declaró que desde su escritorio tenía buena visibilidad hacia las dos puertas que estaban en la parte del frente del negocio.[107] Además, testificó que se encontraba de pie ya que había terminado de trabajar con unos documentos.[108] En ese momento, el cliente a quien estaba atendiendo el señor Vélez Vega se fue del local. La testigo lo observó salir del negocio y se volteó hacia su escritorio para seguir trabajando cuando, en cuestión de segundos, escuchó una voz que le ordenó a su jefe entregarle el dinero. Inmediatamente la señora Pérez Morales miró hacia el área del mostrador del negocio, en donde se encontraba su jefe y de donde provenía la voz que escuchó.[109] En ese momento, observó a un individuo que estaba apuntando al señor Vélez Vega de frente con un arma.

A preguntas del Fiscal, la testigo declaró que no podía describir al asaltante, pero señaló que era una persona de piel blanca y delgada. Señaló además que era más o menos de

---

[105] Transcripción de la prueba oral, Apéndice, pág. 145.

[106] A preguntas de la defensa, la señora Pérez Morales dijo no poder recordar la hora exacta en que ocurrieron los hechos, pero que "[r]ondaban las 11:00 de la mañana". La testigo respondió que estaba en el negocio desde las 9:00 am, hora en que comenzaba su jornada laboral. Íd., pág. 158.

[107] Juliancito Gas contaba con tres puertas. Dos de ellas se encontraba en la parte frontal del negocio, con salida hacia la acera de la calle Madre Dominga. Una estaba ubicada a la derecha y la otra puerta a la izquierda de la fachada frontal de la estructura. Además, había una tercera puerta que estaba ubicada en el costado derecho del negocio, hacia la parte trasera.

[108] Íd., pág. 148.

[109] Íd., pág. 150.

la misma altura que su jefe. También reconoció que no pudo ver el rostro del asaltante porque lo tenía tapado con algo oscuro, como una careta o una media, que impedía verle la cara. Declaró además que el asaltante traía puestas unas gafas.[110] Sobre su vestimenta, la testigo declaró que el asaltante vestía una camisa tipo "t-shirt" con líneas y un pantalón corto, pero de esos que "no se sabe si es largo o corto".[111]

La señora Pérez Morales declaró que una vez el asaltante le ordenó a su jefe que le entregase el dinero, éste le contestó "¿que te dé que?", y se abalanzó sobre el asaltante para tratar de quitarle el arma de fuego.[112] En ese momento ambas personas se movieron hacia el frente y la testigo los perdió de vista, ya que se puso muy nerviosa y se quedó paralizada. Entonces, escuchó una detonación que la hizo gritar. Luego de la detonación, no escuchó a nadie, razón por la cual se acercó hacia el área del mostrador y vio de pie al asaltante, que quedó pillado en unas tablillas que se encontraban en el lugar, y trataba de zafarse de ellas.[113] La testigo señaló que, en vez de huir del lugar, el asaltante se acercó a ella y le exigió también que le entregara el dinero. Ella le respondió que no había ningún dinero que le pudiera entregar. Entonces el asaltante se paró en la puerta izquierda del negocio,[114] e hizo un movimiento con la cabeza hacia arriba

---

[110] Íd., pág. 151.
[111] Íd., pág. 153.
[112] Íd., pág. 151.
[113] Íd., pág. 152.
[114] Íd., pág. 153.

y hacia abajo.[115] Luego salió del negocio y se alejó caminando.[116] La testigo declaró que todo el incidente, desde que escuchó por primera vez la voz exigiendo la entrega del dinero hasta que el asaltante salió del negocio, duró alrededor de un minuto.[117]

La testigo declaró que luego que el asaltante salió fue a su escritorio para buscar el teléfono y llamó al 9-1-1. Entonces salió gritando del negocio hacia la calle. Allí, mientras la atendía por teléfono un técnico de emergencias del 9-1-1, miró hacia la calle que baja en dirección al centro del pueblo de Yauco y vio al asaltante, que ya se había quitado lo que le cubría el rostro, caminando por la acera en esa dirección. El asaltante estaba de espaldas hacia ella, y la testigo declaró que le pudo ver la cabeza y el cabello, el cual describió como castaño, negro, oscuro.[118] Contemporáneo con esto, comenzó a llegar mucha gente al lugar de los hechos. La testigo declaró que unas personas que estaban limpiando la acera al otro lado de la calle cruzaron hacia el negocio para ver qué había ocurrido.[119] Además de estas personas, llegó una ambulancia y una patrulla de la policía municipal que fue alertada de la situación.[120]

Durante el contrainterrogatorio, la señora Pérez Morales reconoció que cuando ocurrió el incidente la víctima recién acababa de entrar al negocio.[121] Señaló que la víctima entró

---

[115] Íd., pág. 154.
[116] Íd.
[117] Íd.
[118] Íd., pág. 156.
[119] Íd. Entre estas personas se encontraba el señor Feliciano Jácome.
[120] Íd.
[121] Íd., pág. 159.

al negocio por la puerta izquierda. A preguntas de la defensa, aclaró que cuando dice puerta izquierda se refiere desde donde ella trabaja, no si uno mira el negocio de frente.[122] La testigo mencionó que usualmente la mayoría de las personas entraban por la puerta izquierda porque en la puerta derecha siempre había cilindros de gas.[123]

Consecuentemente, la defensa le preguntó sobre las declaraciones anteriores que había consignado mediante declaración jurada sobre el incidente ocurrido esa mañana.[124] La señora Pérez Morales aceptó que anteriormente declaró que el asaltante era más bajo de estatura que la víctima.[125] Además, reconoció que en su declaración jurada describió que el asaltante tenía la cara tapada con un paño oscuro.[126] Asimismo, a preguntas de la defensa, la testigo declaró que observó los brazos del asaltante, pero no vio ningún tatuaje en sus brazos.[127] La testigo también expresó que la Fiscalía no la sometió a una rueda de voz para identificar al sospechoso del asalto.[128]

Posteriormente, la señora Pérez Morales reiteró que el asaltante se paró en la puerta izquierda.[129] A preguntas de la defensa, la testigo aclaró que cuando dijo en el directo que el asaltante miró hacia arriba y hacia abajo se refirió a que

---

[122] Íd.
[123] Íd., pág. 160.
[124] Íd., pág. 161.
[125] Íd.
[126] Íd., págs. 161-162.
[127] Íd., pág. 162. La defensa aseveró que el recurrido tiene tatuajes en sus brazos.
[128] Íd.
[129] Íd., pág. 163.

miró hacia la derecha, pues hay una cuesta hacia esa dirección.[130] La testigo también afirmó que no hubo nada más que le llamó la atención cuando el individuo se paró en la puerta y salió del negocio.[131] Más adelante la testigo aceptó que cuando el asaltante salió del negocio tenía el arma en sus manos y que no vio que la escondiera.[132]

Consecuentemente, la testigo buscó su teléfono inalámbrico, salió del negocio por la puerta derecha y vio nuevamente al individuo.[133] En el re contrainterrogatorio se dio el siguiente intercambio sobre ese suceso:

> Defensa: Salgo por la puerta gritando y llamé al 911. Así usted lo dice en la declaración jurada.
> Testigo 3: Es correcto.
> Defensa: Y mire a ver si horita cuando usted dice que salió no había nadie en ese momento, si usted dijo eso.
> Testigo 3: Bueno en el momento que pise afuera no había nadie.[134]

Además, a preguntas de la defensa, la testigo afirmó que en su declaración jurada expresó que estaba "gritando y hablando con el del 911" y que ahí fue que "llegaron los barrenderos".[135] Posteriormente, la defensa preguntó: "¿Pero ellos, ellos no estaba[n], ellos no estaban al frente del negocio? Según usted", a lo que la testigo contestó "[e]staban un poquito al frente sí, pero un poquito arriba".[136]

---

[130] Íd.
[131] Íd., pág. 164.
[132] Íd., pág. 169.
[133] Íd., págs. 164-165.
[134] Íd., pág. 174.
[135] Íd., págs. 174-175.
[136] Íd., pág. 176.

B. <u>Testimonio del Sr. Hipólito Feliciano Jácome.</u>

El señor Feliciano Jácome comenzó su testimonio explicando que, para la fecha de los hechos en controversia, trabajaba como barrendero en el Municipio de Yauco. El día de los hechos se reportó a trabajar en el Departamento de Obras Públicas del municipio, y le asignaron la limpieza de la calle Madre Dominga, donde ubica Juliancito Gas.[137] A eso de las 11:30 de la mañana el señor Feliciano Jácome se encontraba en la calle Madre Dominga, frente al negocio, limpiando la acera de la orilla contraria de la carretera. Allí observó que más arriba de la calle, en la misma acera donde se encuentra el negocio, venía caminando un joven, bajando la calle, en dirección hacia el negocio. El testigo declaró que pudo observar a esta persona a una distancia aproximada de ochenta pies.[138] A preguntas del Fiscal, afirmó que el joven que observó esa mañana era delgado y de piel blanca y vestía una camisa tipo "t-shirt" de franjas amarillas y negras. También, declaró que en ese momento pudo observar el rostro de la persona por unos segundos ya que no tenía nada puesto que le tapara la cabeza ni la cara.[139]

Luego de observar al joven, el testigo declaró que continuó en sus labores de limpieza.[140] Acto seguido, observó a una persona que salió del negocio por la entrada de la derecha. Justo después, se escuchó un fuerte ruido que el

---

[137] El testigo declaró que ese día se reportó a trabajar al Departamento de Obras Públicas municipal a las 8:00 de la mañana. <u>Íd.</u>, págs. 180-181.
[138] <u>Íd.</u>, págs. 181-182.
[139] <u>Íd.</u>, pág. 183.
[140] El testigo declaró que no pudo observar si el joven que describió caminando por la acera entró al negocio. <u>Íd.</u>, págs. 207-208.

testigo describió como una explosión de un cilindro de gas o una goma de carro.[141] Entonces, el testigo observó que la persona que salió momentos antes del negocio se montó en su carro y salió a toda prisa del lugar, deteniéndose más arriba en un puesto de gasolina que se encontraba en la misma calle Madre Dominga. En ese lugar se encontraba una patrulla de la Policía Municipal de Yauco y la persona habló con el agente que estaba allí. El señor Feliciano Jácome testificó que volvió su mirada nuevamente hacia el negocio y observó que salió de allí, por la puerta de la izquierda, una persona encapuchada que se detuvo justo en la puerta.[142] Relató que él y la persona encapuchada se miraron.[143] El testigo describió la capucha como de color verde oscuro, y explicó que la misma le cubría la cabeza y parte del rostro.[144] En ese mismo momento, la persona se quitó con ambas manos la capucha que le cubría el rostro y se la colgó al cuello. Acto seguido, la persona bajó el escalón que separa el negocio del nivel de la acera, y comenzó a caminar bajando la calle Madre Dominga, en dirección al pueblo de Yauco.[145]

A preguntas del Fiscal, el testigo declaró que la persona que salió del negocio encapuchado era la misma persona que observó momentos antes caminando en esa dirección.[146] El testigo declaró que pasó alrededor de un minuto entre el momento en que escuchó la "explosión" y vio a la persona

---

[141] Íd., pág. 183.
[142] Íd., pág. 185.
[143] Íd.
[144] Íd.
[145] Íd., pág. 186.
[146] Íd.

encapuchada descubrir su rostro y salir del negocio.[147] Una vez el sospechoso salió del negocio y se fue caminando, el testigo declaró que un agente de la Policía Municipal de Yauco llegó al área del negocio a toda velocidad en su patrulla. Según declaró, alcanzó a hablar con el agente y le dio una descripción del sospechoso del asalto.[148] En cuestión de minutos la calle Madre Dominga se llenó de agentes de la Policía de Puerto Rico y de la Policía Municipal de Yauco.

Según declaró el testigo, uno de esos agentes estatales lo sacó del área y lo trasladó al cuartel de la policía estatal en Yauco. No fue hasta horas de la tarde del mismo día de los hechos que el agente investigador del caso, el señor José Torres Cruz, realizó dos ruedas de confrontación fotográfica con el señor Feliciano Jácome. En la primera de ellas, el testigo identificó a una persona como el autor del crimen.[149] A preguntas del Fiscal, el señor Feliciano Jácome testificó que le especificó al agente Torres que la persona señalada "se parecía, al sujeto que [] había visto salir de la escena del crimen, pero que no era".[150] En la segunda rueda fotográfica, Feliciano Jácome no señaló a nadie como presunto autor de los hechos. El 23 de febrero de 2012, se realizó una tercera rueda fotográfica en la que el testigo identificó nuevamente a la misma persona de la primera rueda como el

---

[147] Íd., pág. 187.
[148] La descripción ofrecida al agente de la Policía Municipal fue la de un sujeto blanco, delgado, con una camisa tipo "t-shirt" de franjas amarillas y negras horizontales. Íd., pág. 188.
[149] Véase Exhibit A de la Defensa. La persona identificada fue el Sr. Alex Rodríguez.
[150] Transcripción de la prueba oral, Apéndice, pág. 190.

autor de los hechos.[151] El testigo señaló que le advirtió al agente investigador que la persona señalada se parecía pero que no era la persona que él vio salir del negocio el día de los hechos.[152]

Finalmente, el día 24 de febrero de 2012, esto es, tres días después de los hechos, el agente Torres Cruz buscó al señor Feliciano Jácome a su residencia y lo trasladó a la comandancia de Ponce para realizar la primera de dos ruedas de confrontación personal. Durante esa primera rueda de confrontación, el testigo declaró que observó desde un cuarto a través de un cristal a un total de cinco personas, enumerados del 1 al 5, con color de piel, ojos, cabello, y otras características similares. En esa primera rueda, el testigo le indicó al agente investigador que ninguno de esos sujetos era la persona que él vio salir del negocio el día de los hechos.[153] Luego de la primera confrontación personal, el testigo declaró que lo llevaron a otra habitación en la cual se encontraba solo. Al cabo de un rato, el agente Torres Cruz lo buscó nuevamente para una segunda confrontación personal. Se realizó el mismo procedimiento. Esta vez, de los cincos sujetos presentes en la rueda, el señor Feliciano Jácome identificó al número 1 como la persona que vio salir de la escena del crimen el día de los hechos.[154] El testigo declaró

---

[151] Véase Exhibit B de la Defensa.
[152] Transcripción de la prueba oral, Apéndice, pág. 191.
[153] Íd.
[154] Íd., págs. 192-193.  La persona identificada con el número 1 en esa rueda de confrontación personal es el aquí recurrido, señor Toro Martínez. En el juicio el testigo señaló que la persona que identificó en la rueda de confrontación personal y el recurrido son la misma persona. Íd., pág. 193.

que demoró de veinticuatro a treinta segundos en identificar a la persona identificada con el número 1 como el sospechoso del crimen. A preguntas del fiscal, declaró que el día de los hechos la visibilidad era óptima en el lugar ya que "[e]l sol alumbraba en todo su apogeo".[155]

La defensa del señor Toro Martínez tuvo la oportunidad de contrainterrogar al señor Feliciano Jácome. A preguntas de la defensa, el testigo declaró que pudo ver el rostro del asaltante a una distancia aproximada de treinta y ocho o treinta y nueve pies, que es la distancia aproximada entre el negocio y la acera contraria de la calle en donde se encontraba barriendo en ese momento.[156] Además, la defensa impugnó el testimonio del señor Feliciano Jácome mediante testimonios previos contenidos en la declaración jurada prestada por éste. Específicamente, se cuestionó el hecho de que por primera vez en juicio declaró que pudo observar el rostro del joven que venía caminando por la calle Madre Dominga en dirección hacia el negocio momentos antes del asalto. El testigo mencionó que, aunque brevemente, pudo observar inicialmente el rostro del joven que venía caminando por la calle.

Por otro lado, la defensa cuestionó al señor Feliciano Jácome sobre las puertas del negocio. El testigo aclaró que cuando dice puerta izquierda o puerta derecha se refiere desde

---

[155] Íd.
[156] Íd., pág. 202.

donde él observaba el negocio.[157] Consistente con lo anterior, testificó que "[e]l sujeto salió por la izquierda".[158]

Añadió que cuando el asaltante salió del negocio por la puerta izquierda, se quedó mirándolo y le observó el rostro nuevamente porque se quitó allí mismo la capucha que le cubría la cabeza y parte de la cara.[159] A preguntas de la defensa el testigo declaró que no observó al joven entrando en el negocio propiedad de la víctima. Tampoco observó ningún arma de fuego el día de los hechos en las manos del asaltante.[160] Además, el testigo declaró que cuando llegó la patrulla de la policía municipal de Yauco no le dijo que el sospechoso de cometer el crimen se había ido caminando en dirección al pueblo de Yauco.[161] Del testimonio también surge que el señor Feliciano Jácome en ningún momento observó que el asaltante tuviera gafas puestas.[162] Feliciano Jácome contestó también que el otro barrendero que le acompañaba ese día, de nombre Edwin, no pudo identificar a nadie con relación a los hechos del caso durante la rueda de identificación personal.[163] Reconoció a preguntas de la defensa, que le indicó al agente investigador del caso que la persona que salió del negocio tenía el pelo "rubión, medio rubión".[164] También aceptó que el día de los hechos indicó que el joven que observó medía 5'5 a 5'8.[165]

---

[157] Íd., pág. 196.
[158] Íd.
[159] Íd., págs. 203-204.
[160] Íd., págs. 207-208.
[161] Íd., pág. 215.
[162] Íd., pág. 214.
[163] Íd., pág. 217.
[164] Íd., pág. 221.
[165] Íd.

Sobre las ruedas de identificación fotográfica en las que participó el señor Feliciano Jácome, el testigo aceptó que surge del acta de confrontación de la primera rueda de fotografías que se identificó a Alex Rodríguez como la persona autora de los hechos.[166] Además, reconoció que en el acta de confrontación de la tercera rueda de fotografías aparece identificada la misma persona, Alex Rodríguez.[167] Ahora bien, el testigo señaló que en ningún momento dijo que esa foto correspondía al autor, que solo dijo "[q]ue parecía, pero que no era".[168] A preguntas de la defensa, el señor Feliciano Jácome reconoció que en una declaración jurada hizo constar que la persona que identificó en la confrontación de fotografías se parecía, pero no era. Sin embargo, esa declaración jurada se realizó después que identificara al señor Toro Martínez en la rueda de detenidos y luego de haber identificado a Alex Rodríguez en dos ocasiones previas.[169]

Cuando se le preguntó sobre la rueda de confrontación personal, el testigo señaló que según su percepción todos los participantes tenían características similares, aunque no eran exactos.[170] La defensa entonces expresó: "le pregunto yo y usted me dice, si el único delgado allí o sea, que tiene la cara delgada así es este señor que está aquí, número uno".[171] A esto, el señor Feliciano Jácome contestó: "El número 1".[172] Consecuentemente, la defensa preguntó si las personas

---

[166] Íd., pág. 222.
[167] Íd., pág. 226.
[168] Íd., pág. 224.
[169] Íd.
[170] Íd., pág. 228
[171] Íd.
[172] Íd.

identificadas con los números 2, 3, 4 y 5 en la segunda rueda -donde el señor Toro Martínez fue identificado- también estuvieron en la primera rueda. El testigo contestó: "no me acuerdo".[173]

Una vez terminó el contrainterrogatorio, el Fiscal realizó un breve re-directo. En el mismo, el testigo aclaró que cuando el joven que mencionó durante su testimonio venía caminando por la calle Madre Dominga, en dirección al negocio, le pudo ver el rostro y que de esa observación pudo describir posteriormente al individuo como que poseía una "mirada profunda".[174] El Fiscal también le preguntó al señor Feliciano Jácome en qué se le parece Alex Rodríguez al señor Toro Martínez a lo que el testigo contestó espontáneamente: "No se parece en nada".[175]

C. Testimonio del Agente José Torres Cruz.

El señor Torres Cruz, agente investigador del caso, relató que trabaja para la División de Homicidios de Ponce de la Policía de Puerto Rico y que el día de los hechos trabajó el turno de las 8:00 de la mañana. A eso de las 11:30 de la mañana, su supervisor le indicó que había ocurrido un asesinato en el pueblo de Yauco y se movilizó al área de la calle Madre Dominga en el sector La Troncha en Yauco, donde ubica el negocio de la víctima.[176] Una vez en la escena del crimen, le informaron que en el cuartel de la policía de Yauco

---

[173] Íd., pág. 230.
[174] Íd., pág. 231.
[175] Íd., pág. 233.
[176] Íd., págs. 278-279. Según la información recopilada por el Agente Torres Cruz, los hechos ocurrieron entre 11:15 y 11:30 de la mañana. Íd., pág. 279.

había dos potenciales testigos de los hechos.[177] A eso de las 7:00 de la noche del día de los hechos, el agente Torres Cruz entrevistó al señor Feliciano Jácome. Éste le narró los hechos según los recordaba y le describió al sospechoso del asalto como una persona blanca, delgada, de aproximadamente 5'6 a 5'8, vestido con una camisa con rayas negras y amarillas y un pantalón largo, posiblemente negro.[178] El testigo señaló que el señor Feliciano Jácome le explicó que luego de observar al individuo vio a otra persona que había entrado anteriormente en el negocio salir del mismo. Entonces escuchó una explosión y al cabo de unos treinta segundos vio salir del negocio a la misma persona que observó caminando por la acera en la entrada izquierda del negocio. El individuo tenía una capucha en la cabeza la cual procedió a quitarse en ese momento y se la colocó en el cuello. Luego se fue caminando de manera normal.[179]

El Fiscal también interrogó al agente Torres Cruz sobre la rueda de fotografías, ya que fue éste quien la llevó a cabo y realizó el acta de confrontación. El agente testificó que el señor Feliciano Jácome le indicó que la persona identificada con el número 2 en el acta de confrontación de la primera rueda de fotografías (Alex Rodríguez) "era el más que se le parecía, pero que no era".[180] No obstante, en el contrainterrogatorio la defensa le replicó: "De hecho si le llega a decir a usted se me parece y no es, usted no tiene

---

[177] Íd., pág. 283.
[178] Íd., pág. 285.
[179] Íd., pág. 286.
[180] Íd., pág. 292.

porque [sic] marcar a [] Alex Rodríguez []. No lo tiene porque [sic] marcar porque precisamente le está diciendo, no es".[181] A esto, el agente Torres Cruz contestó: "Correcto".[182] El agente también reconoció que el documento no aclara que el testigo señaló que la persona identificada se parecía al autor, pero no era.

Como parte de la prueba admitida por el Tribunal, las partes estipularon la fotografía que se tomó de la rueda de confrontación personal mediante la cual el señor Feliciano Jácome identificó al recurrido como el autor de los hechos. En esa fotografía, el señor Toro Martínez portaba el número 1. Por otro lado, el Ministerio Público estipuló las actas de confrontación de las ruedas de fotografías, marcadas como Exhibits A y B de la Defensa.

El Tribunal de Primera Instancia declaró culpable al señor Toro Martínez de los delitos imputados y dictó sentencia en su contra. Lo condenó a un total de 139 años de cárcel por los delitos de asesinato y violación a la Ley de Armas.

El señor Toro Martínez apeló de manera oportuna la sentencia que emitió el foro de instancia. En su recurso, el recurrido presentó cuatro señalamientos de error. Los primeros tres giraron en torno a la suficiencia y confiabilidad de la prueba presentada por el Ministerio Público para probar su culpabilidad más allá de duda

---

[181] Íd., pág. 318.
[182] Íd.

razonable.[183] El Tribunal de Apelaciones emitió una sentencia donde revocó la sentencia del Tribunal de Primera Instancia. El foro apelativo concluyó que la rueda de confrontación personal en la que el señor Feliciano Jácome identificó al recurrido había sido sugestiva y, por lo tanto, poco confiable. Según dicho foro:

> Al evaluar la foto notamos que los rasgos de tres de las personas (el sospechoso, y las personas identificadas con los números dos y cuatro) sugieren que tienen una edad similar. Las personas con los números tres y cinco lucen de mayor edad que los demás. Dos de las personas, identificadas con los números dos y cinco no se ajustan a la descripción del autor del delito como una persona delgada. Sólo el rostro del sospechoso lucía delgado, pues sólo su rostro tenía los pómulos hundidos. Asimismo, sólo el sospechoso revelaba rasgos caucásicos, aun cuando su cabello era oscuro. De igual manera, en cuanto al rasgo principal provisto por Don Hipólito [Feliciano Jácome], este es, que el autor del delito tenía "mirada profunda", de las cinco personas en la rueda de detenidos, solo el sospechoso se ajustaba <u>notablemente</u> a esa descripción.[184]

Por estos fundamentos, el Tribunal de Apelaciones resolvió que la identificación del recurrido fue sugestiva, y que carecía de la confiabilidad necesaria para que fuera admisible. Excluida esa prueba de identificación, el Tribunal revocó la sentencia apelada sin disponer ninguna otra instrucción para el foro apelado.

Inconforme con esta determinación, la Oficina de la Procuradora General presentó una moción de reconsideración. En síntesis, señaló que no procedía la supresión de la prueba de identificación en esta etapa de los procedimientos, máxime

---

[183] El cuarto señalamiento de error giraba en torno a la duplicación de la pena impuesta por la violación al Artículo 5.04 de la Ley de Armas de Puerto Rico. Apéndice, pág. 387.
[184] Sentencia del Tribunal de Apelaciones, Apéndice, pág. 93.

cuando la defensa del señor Toro Martínez en ningún momento objetó ni intentó suprimir esa evidencia mediante los mecanismos procesales correspondientes. El Tribunal de Apelaciones denegó la moción de reconsideración y la Procuradora General presentó un recurso de *certiorari* ante este Tribunal.

En su recurso, la Procuradora General alegó que el Tribunal de Apelaciones erró al suprimir la identificación del señor Toro Martínez cuando la defensa nunca presentó una moción de supresión de la identificación bajo la Regla 234 de Procedimiento Criminal, 34 LPRA Ap. II, R. 234. Además, señaló que erró el foro apelativo intermedio al evaluar la admisibilidad de la prueba de identificación cuando en el alegato de la defensa del señor Toro Martínez no se presentó ninguna controversia en torno a la admisibilidad de esa prueba. Por último, la Procuradora General señaló que la determinación que realizó el tribunal sentenciador merecía deferencia y debía sostenerse ante la ausencia de pasión, perjuicio, parcialidad o error manifiesto. Este Tribunal decidió expedir el auto en reconsideración.

Por su parte el señor Toro Martínez compareció y solicitó que confirmáramos la sentencia del Tribunal de Apelaciones. Sin embargo, señaló que este Tribunal carece de jurisdicción para atender el recurso presentado por la Procuradora General, toda vez que la decisión del Tribunal de Apelaciones de revocar la sentencia condenatoria del Tribunal de Primera Instancia constituye una absolución que, bajo la doctrina de

doble exposición, es inapelable por parte del Ministerio Público.

II

Como cuestión de umbral, conviene resaltar que ni la protección constitucional contra la doble exposición ni su jurisprudencia interpretativa prohíben que examinemos el recurso de autos. Esto, pues, "[e]l acusado que apela una sentencia de convicción asiente implícitamente a ulterior exposición por la misma ofensa, al menos en cuanto al proceso apelativo". E.L. Chiesa Aponte, Derecho Procesal penal de Puerto Rico y Estados Unidos, Ed. Forum, 1992, Tomo II, sec. 16.3, pág. 395. Por consiguiente, nada nos impide examinar los señalamientos de error presentados por el Estado sobre el alegado error de derecho que cometió el Tribunal de Apelaciones. Aclarado lo anterior, procedemos a discutir el derecho aplicable a esta controversia.

A. Prueba más allá de duda razonable

Por las consecuencias que acarrean los procesos criminales, un acusado tiene un derecho constitucional a que su culpabilidad se pruebe más allá de duda razonable. Su razón de ser es que, como sociedad civil y democrática, preferimos la impunidad de un culpable a la condena de un inocente.[185] Este estándar probatorio tiene raíces profundas en nuestro ordenamiento jurídico e incluso se considera

---

[185] Véase In re Winship, 397 US 358, 372 (1970) (J. Harlan, Op. concurrente) ("I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free"); Pueblo v. Cruz Granados, 116 DPR 3, 25 (1984) (J. Negrón García, Op. conformidad) ("en caso de duda, hay que preferir la impunidad de un culpable a la condena de un inocente").

parte fundamental del debido proceso de ley. In re Winship, 397 US 358 (1970). Además, se concibe como una concretización de la presunción de inocencia, reconocida expresamente en nuestra Constitución. Const. PR, Art. II, Sec. 11; Pueblo v. Casillas, Torres, 190 DPR 398, 413-414 (2014); In re Winship, supra, pág. 363. Finalmente, la ley también recoge este estándar probatorio, pues la Regla 110 de Procedimiento Criminal dispone que "en caso de existir duda razonable acerca de [la] culpabilidad [de un acusado], se le absolverá". 34 LPRA Ap. II, R. 110.

Reconocidas sus fuentes, debemos precisar qué constituye prueba más allá de duda razonable. En primer lugar, conviene aclarar que no se requiere establecer la culpabilidad con certeza matemática. Pueblo v. Pagán Santiago, 130 DPR 470, 480 (1992). Se trata, más bien, de que la prueba del Estado sea "satisfactoria, es decir, prueba que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". Pueblo v. Maisonave Rodríguez, 129 DPR 49, 65 (1991). Por consiguiente, "la insatisfacción de la conciencia del juzgador con esa prueba produce lo que conocemos como duda razonable". Pueblo v. Acevedo Estrada, 150 DPR 84, 100 (2000).

Para lograr una convicción el Estado debe probar más allá de duda razonable (1) cada uno los elementos constitutivos del delito y (2) su conexión con el acusado. Íd., pág. 99; E.L. Chiesa Aponte, op. cit., sec. 11.2, pág. 96. El segundo elemento es fundamental, pues "[p]uede haber prueba más allá de duda razonable sobre que se cometió

un asesinato u homicidio . . . pero sin embargo, quedar duda razonable en torno a si el acusado fue el autor o co-autor del delito, lo que acarrea su absolución". E.L. Chiesa Aponte, Derecho Procesal penal de Puerto Rico y Estados Unidos, Ed. Forum, 1995, Tomo I, sec. 5.1, pág. 137. De ahí que la identificación del acusado sea un proceso estrechamente vinculado con si se probó la culpabilidad conforme a derecho.

Finalmente, conviene reiterar el alcance de nuestra revisión apelativa con respecto a este derecho constitucional. En primer lugar, "determinar si se probó la culpabilidad más allá de duda razonable es revisable como cuestión de derecho". Pueblo v. Acevedo Estrada, supra, pág. 100. Ahora bien, "las determinaciones que hace el juzgador de los hechos no deben ser descartadas arbitrariamente ni tampoco deben sustituirse por el criterio del foro apelativo, a menos que de la prueba admitida surja que no existe base suficiente que apoye tal determinación". Íd., pág. 99. Sin embargo, la protección constitucional impide que esta deferencia sea absoluta, pues cuando "un análisis ponderado de la prueba desfilada ante el foro de instancia nos ha producido duda razonable y fundada sobre si la culpabilidad del apelante ha quedado establecida más allá de duda razonable, no hemos vacilado en dejar sin efecto un fallo condenatorio". Pueblo v. Cabán Torres, 117 DPR 645, 655 (1986).

B. Identificación de un sospechoso

El proceso de identificación de un sospechoso de un acto delictivo es de importancia crucial para nuestro ordenamiento jurídico penal. Para que un tribunal encuentre culpable a un acusado de cometer un delito el Ministerio Público debe demostrar que la persona acusada es la responsable de los hechos. Además, hace casi cincuenta años, este Tribunal reconoció que "[l]os mayores extravíos en la administración de justicia lo ocasionan los errores en la identificación de los acusados". Pueblo v. Gómez Incera, 97 DPR 249, 252 (1969); Pueblo v. Hernández González, 175 DPR 274, 292 (2009).

Existen dos procesos para limitar el alcance de una identificación: (1) una solicitud de supresión de prueba de identificación para evitar que se admita, y (2) una vez se admita, la impugnación de su confiabilidad durante el juicio. La solicitud de supresión de prueba de identificación tiene una vertiente procesal y una sustantiva. Con relación al procedimiento, en Pueblo v. Rey Marrero, 109 DPR 739 (1980), establecimos que una solicitud de supresión de prueba de identificación **deberá realizarse al menos cinco días antes del juicio**, según dispone la Regla 234 de Procedimiento Criminal.

Por otro lado, en términos sustantivos, el fundamento principal para solicitar la supresión de una prueba de identificación es que el proceso fue innecesariamente sugestivo, lo cual contraviene el debido proceso de ley. E.L. Chiesa Aponte, op. cit., sec. 5.3, pág. 166 (el debido proceso de ley "protege contra vicios de sugestividad en el procedimiento de identificación en cualquier etapa, aunque no

se haya presentado aún denuncia o acusación"). En atención a que el Tribunal de Apelaciones eliminó la prueba de identificación del recurrido por entender que esta fue sugestiva, procedo a analizar esta protección.

En Simmons v. United States, 390 US 377, 384 (1968), extendido en Neil v. Biggers, 409 US 188 (1972), el Tribunal Supremo de Estados Unidos resolvió que la admisibilidad de la prueba de identificación debe analizarse según la totalidad de las circunstancias del caso. De modo que, aunque la confrontación mediante una rueda de detenidos haya sido innecesariamente sugestiva, esto de por sí no implica una supresión automática. Posteriormente, en Manson v. Brathwaite, 432 US 98 (1977), el Tribunal reafirmó esta norma y adoptó de manera definitiva los criterios de confiabilidad de la prueba de identificación a la luz de la totalidad de las circunstancias. Estos criterios de confiabilidad fueron acogidos por este Tribunal en Pueblo v. Peterson Pietersz, 107 DPR 172, 183 (1978) ("Se señalan como factores principales que deben guiar la posibilidad de un error de identificación la oportunidad que tuvo el testigo de observar al ofensor al tiempo en que cometía el crimen, el grado de atención del testigo, la corrección de la descripción previa del criminal por el testigo, el nivel de certeza que demostró el testigo en la confrontación, y el tiempo que transcurrió entre el crimen y la confrontación").

Además de la solicitud de supresión de evidencia, una vez se admite la prueba de identificación con arreglo a las normas antes indicadas, el acusado puede impugnar su valor

probatorio durante el juicio. Consecuente con lo anterior, le corresponde al juzgador estimar su valor probatorio y suficiencia para una convicción. E.L. Chiesa Aponte, op. cit., sec. 5.4, pág. 177; Pueblo v. Hernández González, supra, pág. 300. La apreciación del juzgador de los hechos sobre este particular merece gran deferencia y solo puede revocarse si se demuestra que hubo prejuicio, parcialidad o error manifiesto. Íd., pág. 298. Ahora bien, los tribunales apelativos evaluarán esa prueba de identificación, en conjunto con el resto de la prueba, para determinar si se probó más allá de duda razonable que el acusado fue el autor del delito.

III

La Oficina de la Procuradora General presentó un recurso para revisar una sentencia del Tribunal de Apelaciones que revocó el fallo y sentencia condenatoria que emitió el Tribunal de Primera Instancia. En sus primeros dos señalamientos de error, la Procuradora General señala que se equivocó el Tribunal de Apelaciones al suprimir la prueba de identificación cuando ésta fue debidamente admitida por el Tribunal de Primera Instancia y la defensa del señor Toro Martínez no presentó una solicitud de supresión de evidencia al amparo de la Regla 234 de Procedimiento Criminal, supra, ni argumentó en torno a la admisibilidad de la misma en el recurso que se presentó ante el Tribunal de Apelaciones.

En su tercer y último señalamiento de error, la Procuradora General alega que erró el Tribunal de Apelaciones al suprimir la prueba de identificación sin haber quedado

demostrado que existió pasión, prejuicio, parcialidad o error manifiesto por parte del foro sentenciador al admitirla.

El Tribunal de Apelaciones evaluó los autos originales del caso, así como la transcripción de la prueba oral y la evidencia admitida por el Tribunal de Primera Instancia.[186] Luego de hacer su análisis, revocó la sentencia del tribunal de instancia. Fundamentó su decisión en que la prueba de identificación admitida por el foro sentenciador "estuvo viciada por sugestión y, por tanto, carece de la confiabilidad necesaria para que sea admisible en el juicio porque las circunstancias fueron sugestivas".[187] Esta sugestión deriva, según el foro apelativo, en que entre las personas que participaron junto al señor Toro Martínez en la rueda de detenidos en la que fue identificado, sólo él revelaba rasgos caucásicos y un rostro delgado por tener los pómulos hundidos. Además, el Tribunal de Apelaciones entendió que el señor Toro Martínez era el único que cumplía con la característica principal brindada por el testigo Feliciano Jácome, esto es, tener la "mirada profunda".[188] Sin embargo, al revocar la determinación del foro sentenciador, el Tribunal de Apelaciones no hizo ninguna distinción sobre la etapa en la que se impugnó la confiabilidad de la prueba de identificación. Así, evaluó el proceder del Tribunal de Primera Instancia conforme a las normas establecidas por las

---

[186] Sentencia del Tribunal de Apelaciones, Apéndice, pág. 71.
[187] Íd., pág. 93.
[188] Íd.

Reglas 234 y 252.1 de Procedimiento Criminal, supra. Se equivocó el foro apelativo al actuar de esta manera.

Debe quedar claro que en este caso no estamos ante una impugnación, por la defensa del señor Toro Martínez, de la confiabilidad de la prueba de identificación para impedir que ésta sea **admitida** en evidencia. Por el contrario, el expediente de este caso no refleja ninguna instancia previa a la admisión de la prueba de identificación en la que la defensa del señor Toro Martínez haya impugnado la admisibilidad de la prueba ofrecida por el Ministerio Público. Tal y como señala la Procuradora General, la defensa del señor Toro Martínez no presentó en ningún momento una solicitud de supresión de la prueba de identificación al amparo de la Regla 234 de Procedimiento Criminal, supra, y del caso Pueblo v. Rey Marrero, supra, ni argumentó durante el juicio sobre su inadmisibilidad. Por lo tanto, no hay duda de que la prueba de identificación en este caso fue admitida por el Tribunal de Primera Instancia conforme a derecho. En cambio, el foro intermedio debió circunscribir su análisis al valor probatorio y la suficiencia de la prueba para encontrar al recurrido culpable más allá de duda razonable.

Por consiguiente, la controversia que tenemos ante nuestra consideración es si el Estado probó más allá de duda razonable la conexión del señor Toro Martínez con el delito. La Opinión del Tribunal concluye que sí. Para ello, da total deferencia al Juez del Tribunal de Primera Instancia, quien creyó la versión del señor Feliciano Jácome y del agente Torres Cruz

de que en dos ruedas de fotografías el primero indicó que uno de los individuos se parecía, pero no era la persona. Por mi parte, no tengo certeza ni convicción de que el señor Toro Martínez asesinó al señor Vélez Vega. Mi conciencia no está exenta de preocupación. Veamos.

La única prueba que conecta al señor Toro Martínez con el delito es el testimonio del señor Feliciano Jácome. Éste estaba el día de los hechos en la acera contraria frente al negocio de la víctima, limpiando la calle Madre Dominga como parte de su trabajo. Según su testimonio, pudo observar el rostro descubierto del sospechoso en dos ocasiones, cuando observó a un joven caminando por la misma acera donde queda ubicado el negocio y cuando el sospechoso de cometer el asalto salió del mismo. Luego de identificar en dos ocasiones a otra persona como el autor de los hechos, el señor Feliciano Jácome identificó al señor Toro Martínez durante una rueda de detenidos que se realizó tres días después de los hechos.

Para evaluar la suficiencia en derecho del testimonio del señor Feliciano Jácome, conviene comparar su testimonio con el de la señora Pérez Morales, discutir las identificaciones previas que realizó el señor Feliciano Jácome y aquilatar el valor probatorio de la identificación mediante la rueda de detenidos. Solo de esta manera es posible precisar si se probó más allá de duda razonable la culpabilidad del señor Toro Martínez.

En primer lugar, hay varias inconsistencias con respecto a los testimonios de los dos testigos principales. La señora Pérez Morales señaló que el color de pelo del asaltante era

"castaño, negro, oscuro". Por su parte, el señor Feliciano Jácome lo describió como "rubión, medio rubión". La señora Pérez Morales mencionó en su declaración jurada que el asaltante era más bajito que la víctima, quien medía 5'10. Luego en el juicio dijo que eran más o menos de la misma estatura. Por su parte, el señor Feliciano Jácome expresó que el asaltante medía entre 5'5 a 5'8. No obstante, el señor Toro Martínez mide 5'11.[189]

La señora Pérez Morales expresó que el asaltante tenía gafas durante los hechos. El señor Feliciano Jácome nunca vio gafas. De igual manera, la señora Pérez Morales testificó que cuando el asaltante salió del negocio tenía el arma en sus manos. Sin embargo, el señor Feliciano Jácome no vio ningún arma, a pesar de que alegó ver al asaltante salir del negocio y quitarse la capucha con ambas manos. La señora Pérez Morales testificó que cuando el asaltante se paró en la puerta izquierda del negocio miró hacia ambos lados y **luego** salió del negocio. Por su parte, el señor Feliciano Jácome testificó que, **antes de bajar el escalón del negocio**, el asaltante se quitó la capucha y lo miró a los ojos. Es decir, ambos testigos describen el mismo momento de manera distinta. Finalmente, ambos expresan que el asaltante salió por la puerta izquierda. Solo hay un problema. Que surge del propio testimonio de ambos que se refieren a puertas distintas, cada cual desde su propio ángulo. Por consiguiente, vistas las puertas del negocio desde afuera, el señor Feliciano Jácome vio al asaltante salir por

---

[189] Íd., pág. 311.

la puerta izquierda, en cambio la señora Pérez Morales testificó que el asaltante salió por la puerta derecha.

Por otro lado, la señora Pérez Morales señaló que cuando salió del negocio no había nadie. Esto pone en duda la proximidad del señor Feliciano Jácome al negocio y, por ende, su capacidad de observar al sospechoso. Ahora bien, incluso en su mejor luz el señor Feliciano Jácome aceptó que solo vio al asaltante por unos breves segundos y la distancia más cercana fue treinta y ocho pies.

Todas estas inconsistencias arrojan dudas sobre la capacidad y oportunidad adecuada que tuvo el señor Feliciano Jácome para observar el rostro del asaltante. Conviene recordar que, una vez admitida la identificación, los tribunales deben evaluar esa capacidad y oportunidad para determinar si la culpabilidad se probó más allá de duda razonable. Véase E.L. Chiesa Aponte, op. cit., sec. 5.4, pág. 178; Pueblo v. Toledo Barbosa, 105 DPR 290, 296 (1976) (J. Trías Monge, Op. particular). No podemos "cegarnos ante las múltiples incógnitas, lagunas y contradicciones que el examen global y concienzudo de la prueba revela". Pueblo v. Cruz Granados, 116 DPR 3, 27 (1984) (J. Negrón García, Op. conformidad). Debemos sopesar esas inconsistencias bajo el estándar probatorio aplicable: prueba más allá de duda razonable. Claro está, las inconsistencias no se examinan de forma aislada, ya que típicamente de por sí no son suficientes para revocar un veredicto de culpabilidad. No obstante, procederé a discutir los otros dos factores que influyen en mi análisis.

En segundo lugar, durante las dos ruedas de fotografías el señor Feliciano Jácome identificó a Alex Rodríguez como el autor de los hechos. El Acta de la primera confrontación fotográfica, **celebrada el mismo día de los hechos**, indica: "El (la) testigo del caso, señor(a) <u>Hipólito Feliciano J[á]come</u> identificó la fotografía número <u>2</u> como la que le corresponde a la persona autora de los hechos. Este no corresponde al número asignado a la fotografía del sospechoso". Exhibit A de la Defensa. El número 2 en esa confrontación era Alex Rodríguez. No obstante, el sospechoso de la Policía en ese momento era otra persona.[190] Lo mismo ocurrió en la confrontación fotográfica ocurrida el 23 de febrero de 2012, donde nuevamente el señor Feliciano Jácome identificó a Alex Rodríguez como el autor de los hechos. Ambas actas tienen un espacio para incluir observaciones que fueron dejadas en blanco.

En el juicio el testigo declaró que durante esas confrontaciones solo expresó que se parecía, pero que no era el autor de los hechos. Sin embargo, cuando el Fiscal preguntó en qué se parecían respondió: "en nada". Además, el mismo agente aceptó que si un testigo le dice que una persona se parece al sospechoso, pero no lo es, no debe marcar a nadie, pues no se está identificando a algún sujeto como el autor de los hechos.

Ante la dificultad que siempre presenta acercar la conciencia judicial de los hechos a la realidad extrajudicial,

---

[190] Conviene mencionar que el sospechoso en ese momento no era el señor Toro Martínez.

en García v. A.F.F., 103 DPR 356, 358 (1975), expresamos que es regla auxiliadora "el análisis de perspectiva integral de la prueba, atribuyéndole mayor valor probatorio a la evidencia aportada que contiene la característica de garantía circunstancial de veracidad entre las cuales se destaca la que posee ingredientes de espontaneidad y contemporaneidad con el suceso".

Cónsono con lo anterior, en este caso los Exhibits A y B de la Defensa tienen mayor valor probatorio que lo expresado en el juicio, pues las actas se realizaron contemporáneamente con las ruedas de fotografías. Estas no dan margen a duda de que el señor Feliciano Jácome identificó en dos fechas distintas y más cercanas a los hechos a otra persona como el autor del delito. El foro primario cometió un error manifiesto al creer que el señor Feliciano Jácome no identificó a nadie, sino que solo manifestó que se parecían. Peor aún, la Opinión del Tribunal indica que la "defensa intentó establecer que en las ruedas de fotografías se identificó a otra persona en dos ocasiones". Opinión del Tribunal, pág. 37. No es que la defensa lo intentó establecer, es que las actas comprueban que, en efecto, el testigo en dos ocasiones previas identificó a otra persona como el autor de los hechos. Por consiguiente, no se trata de disminuir la credibilidad de los testigos por meras inconsistencias, como imputa la Opinión del Tribunal, sino de restar credibilidad a un testigo porque existe una prueba de mayor valor probatorio que establece claramente que

el señor Feliciano Jácome identificó no una, sino dos veces, a Alex Rodríguez como el autor del delito.[191]

Finalmente, aunque el foro apelativo erró al **suprimir** la prueba de identificación, aún debemos examinar el **valor probatorio** de la identificación mediante la rueda de detenidos. Esta prueba resulta esencial para determinar si se encontró culpable conforme a derecho, pues se trata del momento preciso en que el señor Toro Martínez se convierte en sospechoso del delito. Examinada la fotografía de la rueda, comparto algunas de las conclusiones del Tribunal de Apelaciones con respecto a la falta de parecido de algunos de sus miembros. Incluso el señor Feliciano Jácome parece coincidir, pues reconoció que el único delgado allí era el señor Toro Martínez. De ser así, el valor probatorio de la identificación se reduce, pues el asaltante era delgado, joven y blanco y el señor Toro Martínez era quien más se asemejaba a esa descripción. Sandra Guerra Thompson, Beyond a Reasonable Doubt?: Reconsidering Uncorroborated Eyewitness Identification Testimony, 41 U.C. David L. Rev. 1487, 1500 (2008) ("[t]he natural impulse that witnesses exhibit to choose a person who, it turns out, resembles the culprit but is actually innocent, is precisely the problem that has led to so many wrongful convictions").

Lo anterior no implica necesariamente que una rueda se pueda suprimir si las similitudes en características físicas no son exactas. El estándar sigue siendo el de

---

[191] Véase escolio 104 de la Opinión del Tribunal.

"innecesariamente sugestivo", pues lo que el debido proceso de ley prohíbe es que el Estado le insinúe al testigo quién es el sospechoso. Ahora bien, una vez se admite esa prueba de identificación, corresponde evaluar su valor probatorio. Mientras más se asemejen los miembros de la rueda, más peso tendrá al determinar si se probó más allá de duda razonable la culpabilidad del acusado. En este caso, las características disímiles entre el señor Toro Martínez y los otros miembros de la rueda, limitan el valor probatorio de la identificación.

Sobre la protección constitucional que hoy examinamos, el Juez Negrón García expresó que "[e]l respeto que nos merezca la libertad determinará los senderos de nuestra sociedad como verdaderamente civil y democrática. Nuestra función es darle contenido al precepto constitucional en su sentido teleológico más profundo". Pueblo v. Cruz Granados, supra, pág. 26. Como intérpretes de la Constitución, nos correspondía examinar si en este caso se cumplió con este mandato constitucional de gran trascendencia.

Al analizar el planteamiento de doble exposición, la Opinión del Tribunal advierte que lo solicitado por el recurrido "tendría el efecto de convertir al Tribunal de Apelaciones en el foro de última instancia". Opinión del Tribunal, pág. 21. Curiosamente, es este Tribunal quien convierte no al Tribunal de Apelaciones, sino al Tribunal de Primera Instancia en el foro de última instancia. Según el Tribunal si un Juez o un jurado le cree a un testigo durante un juicio no importan las inconsistencias, no importa que se identificó a otra persona, no importa cuán imperfecta sea la

rueda de detenidos. De este modo, el Tribunal abdica su deber de darle contenido al precepto constitucional en su sentido teleológico más profundo.

Ante las circunstancias muy particulares de este caso, concluyo que no se probó más allá de duda razonable la culpabilidad del señor Toro Martínez. Analizadas conjuntamente las inconsistencias de los testimonios, la doble identificación de otro sujeto, Alex Rodríguez, como el autor de los hechos, y las imperfecciones en la rueda de detenidos, la prueba resulta insatisfactoria. La prueba no produce certeza o convicción moral ni exime mi conciencia de preocupación e intranquilidad.

Aunque el Juez del Tribunal de Primera Instancia encontró culpable al señor Toro Martínez, tanto el derecho normativo como un alto sentido de justicia facultan al recurrido a acudir a nuestros tribunales apelativos. En Pueblo v. Carrasquillo Carrasquillo, 102 DPR 545, 552 (1974), pronunciamos que "[h]asta tanto se disponga de un método infalible para averiguar sin lugar a dudas dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. Nosotros también tenemos derecho a tenerla tranquila". Hoy nos tocaba a nosotros, Jueces y Juezas del Tribunal Supremo, ejercer ese deber de conciencia. A la luz de las protecciones constitucionales aplicables y los valores colectivos que recogen, debimos resolver que el Ministerio Público no logró probar más allá de duda razonable la conexión del señor Toro Martínez con el lamentable

asesinato ocurrido el 21 de febrero de 2012. Como para la Mayoría el deber de conciencia cesa con el fallo del tribunal sentenciador, disiento.


                                        Maite D. Oronoz Rodríguez
                                             Jueza Presidenta